

# AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY
A Member Company of American International Group, Inc.
A Capital Stock Insurance Company
175 Water Street New York, NY 10038
**NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
AND IS NOT SUBJECT TO ITS SUPERVISION.**

## AIG netAdvantage®

NOTICE: THIS POLICY CONTAINS ONE OR MORE COVERAGE MODULES. CERTAIN LIABILITY COVERAGE PARTS OF THIS POLICY ARE LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER AS REQUIRED. CLAIM EXPENSES SHALL REDUCE THE APPLICABLE LIMITS OF LIABILITY AND ARE SUBJECT TO APPLICABLE RETENTIONS. PLEASE READ THIS POLICY CAREFULLY AND REVIEW IT WITH YOUR INSURANCE AGENT OR BROKER.

Terms appearing in **bold** type have special meanings. See the Definitions for more information.

PRIOR POLICY NUMBER:   **626-17-48**                          POLICY NUMBER:   **966-95-20**

## DECLARATIONS

| ITEMS | | |
|---|---|---|
| 1 | **NAMED INSURED:** | **OFFICE DEPOT, INC.** |
| 1(a) | MAILING ADDRESS: | **2200 OLD GERMANTOWN ROAD DELRAY BEACH, FL 33445** |
| 1(b) | **Subsidiary Coverage:** | ☐ none   ☒ blanket; or   ☐ only those listed by endorsement |
| 2 | **POLICY PERIOD:** From: **March 08, 2007**   To: **March 08, 2008** | 12:01 A.M. at the address in Item 1(a) |

| | LIMITS OF LIABILITY: | | | | |
|---|---|---|---|---|---|
| 3 | **POLICY AGGREGATE:** Aggregate for all coverages combined (including **claim expenses\***): | | | | $15,000,000 |

| 4 | COVERAGE MODULE (OR SECTIONS) | SUBLIMIT OF LIABILITY | RETENTION | RETROACTIVE DATE | FIRST INCEPTION DATE |
|---|---|---|---|---|---|
| | SECURITY LIABILITY | NIL | | Policy Inception | Policy Inception |
| | SECURITY & PRIVACY LIABILITY | $15,000,000 | Security: $250,000 Privacy: $1,000,000 | Security: 03/08/2002 Privacy: 03/08/2007 | Security: 03/08/2002 Privacy: 03/08/2007 |
| | INFORMATION ASSET | $15,000,000 | $250,000 | Not Applicable | 03/08/2002 |
| | BUSINESS INTERRUPTION | $15,000,000 | The greater of: $1,000,000; or the **business interruption loss** during the **8** hour **waiting hours period** | Not Applicable | 03/08/2002 |
| | CYBER EXTORTION | $15,000,000 | $250,000 | Not Applicable | 03/08/2002 |
| | INTERNET MEDIA | NIL | | Not Applicable | Policy Inception |
| | MULTIMEDIA | $15,000,000 | $250,000 | Not Applicable | 03/08/2002 |

EXHIBIT C
PAGE 497

90591 (03/06)                    1          © 2006 American International Group, Inc. All rights reserved.

| | | $250,000 per crisis management event, subject to a 0% co-insurance | $250,000 | Not Applicable | Policy Inception |
|---|---|---|---|---|---|
| | CRISIS MANAGEMENT | | | | |
| | CRIMINAL REWARD | $50,000 | Not Applicable | Not Applicable | Policy Inception |
| | CORPORATE COUNSEL PERFERRED® | NIL | (a) **Non-indemnifiable loss:** $_____ (b) All other **Loss:** $_____ | Not Applicable | Not Applicable |

Sublimit of Liability of "Nil" for any Coverage Module reflects that such module is not being offered.

| 5. | PRIVACY REGULATORY ACTION LIMIT OF LIABILITY: | $250,000 |
|---|---|---|
| 6 | PREMIUM: | $329,250 |
| 7 | NAME AND ADDRESS OF INSURER | |

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY
175 WATER STREET
NEW YORK, NEW YORK 10038

This policy is issued only by the insurance company indicated in this Item 7.

PRODUCER:   **AON RISK SERVICES, INC. OF COLORADO**

PRODUCER LICENSE NO.:

ADDRESS:    **4100 E MISSISSIPPI AVENUE**
            **SUITE 1500**
            **DENVER, CO  80246-6329**

**IN WITNESS WHEREOF,** the **insurer** has caused this policy to be signed on the Declarations by its President, a Secretary and its duly authorized representative or countersigned in states where applicable.

**SECRETARY**                    **PRESIDENT**

_____
**AUTHORIZED REPRESENTATIVE OR**
**COUNTERSIGNATURE (in states where applicable)**

* Subject to an hourly sublimit of 10% and other sublimits as set forth in Clause 5. of the BASE Section, as amended by the Business Interruption Module

EXHIBIT C
PAGE 498

© 2006 American International Group, Inc.  All rights reserved.



AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY

# AIG netAdvantage®

## BASE
### COMMON TERMS, CONDITIONS AND LIMITATIONS

In consideration of the payment of the premium, and in reliance upon the **application** and the statements therein, which form a part of this policy, **we** agree as follows:

## 1. MODULAR FORMAT

This policy shall be comprised of the following components: (i) the Declarations, (ii) this BASE Section, and (iii) one or more optional Coverage Modules. This BASE Section shall be applicable to all Coverage Modules. The terms, conditions, exclusions and other limitations of each Coverage Module shall control solely with respect to coverage afforded by that Coverage Module.

## 2. INSURING AGREEMENTS

For Coverages A and B, and all other claims first made and reported coverage in this policy, solely with respect to **claims** first made against an **insured** and reported to **us** during the **policy period** or any applicable **extended reporting period**, and subject to the other terms, conditions, exclusions and other limitations of this policy, this policy affords the following coverage:

### COVERAGE A: LIABILITY FOR DAMAGES

**We** shall pay amounts, in excess of the applicable Retention, **you** or any **additional insureds** are legally obligated to pay as **damages** and **claims expenses** arising from a **claim** first made against **you** or such **additional insured**, and reported to **us** in writing during the **policy period** or any applicable **extended reporting period**, for **your wrongful acts**.

### COVERAGE B: DEFENSE OF INSUREDS

(1) *Our Duty To Defend Insureds*:  **We** have the right and duty to defend a **suit** brought against any **insured** for covered **wrongful acts**, even if the **suit** is groundless or fraudulent.

(2) *Claim Expenses*:  **We** shall pay for **claim expenses** any **insured** incurs with **our** prior written consent in the defense of a **suit** for covered **wrongful acts** occurring during the **policy period.**

(3) *Our Right To Investigate and Settle Claims*:  **We** have the right, but not the duty, to investigate any **claim** against any **insured.**  In the event **we** investigate any **claim** and **you** incur **claim expenses** with **our** prior written consent as a result of such investigation, **we** shall pay such **claim expenses.**  **We** have the right, but not the duty, to settle any **claim**, with **your** written consent, against an **additional insured** or against **you.**

(4) *Your Right To Settle*:  **You** may settle any **claim** to which this insurance applies provided that **you** do so (i) on behalf of all **insureds**, and (ii) without incurring **loss** in excess of the Retention.

(5) *When Our Duty To Defend Ends*:  **Our** duty to defend ends upon the exhaustion of the policy limit of liability or the applicable sublimit of liability by payment of **loss**, including **claim expenses**.  **Our** duty to defend also ends if **you** fail or refuse to consent to a settlement **we** recommend and the claimant will accept.  **You** must then defend the **claim** at **your** own expense.  As a consequence of such failure or refusal, **our** liability for **loss** shall not exceed the amount for which **we** could have settled such **claim** had **you** consented, plus **claim expenses** incurred prior to the date of such failure or refusal.

1 © 2006 American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 499

## 3. DEFINITIONS

(a) **"Additional insured"** means any natural person or entity (i) that an **organization** has expressly agreed in writing, prior to the commission of a **wrongful act**, to add as an **insured** under this policy, but only for the **wrongful acts** of the **organization**; or (ii) any other person or entity described or listed as such in a Coverage Module of this policy, and (iii) any **employee** of any such described or listed entity.

(b) **"Advertising"** means the material in any publicity or promotion including branding, co-branding, sponsorships and/or endorsements.

(c) **"Application"** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other errors and omissions or media liability policy issued by the **insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time.   **"Application"** shall also include any statements, information, representations and attachments made, prepared or provided by **you** with respect to any security assessment conducted in connection with or involving a request for insurance under this policy.

(d) **"Bodily injury"** means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress at any time.

(e) **"Claim"** means:

(1) a written or oral demand for money, services, non-monetary relief or injunctive relief; or
(2) a **suit**.

(f) **"Claim expenses"** means the reasonable and necessary (i) fees and disbursements charged by an attorney appointed by **us**, and (ii) other fees, costs and expenses incurred in the defense or investigation of a **claim** against an **insured**, either incurred by **us** or by an **insured** with **our** prior written consent.   **"Claim expenses"** shall also include premiums for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **claim** against an **insured** for **your wrongful acts**; however, **we** have no obligation to appeal or to obtain bonds.   This Definition is subject to the limitations set forth in the Definition of **loss**.

(g) **"Computer attack"** means **unauthorized access, unauthorized use**, receipt or transmission of a **malicious code** or **denial of service attack** which:

(1) alters, copies, misappropriates, corrupts, destroys, disrupts, deletes, damages or prevents, restricts or hinders access to, a **computer system**;
(2) results in the disclosure of private or confidential information stored on a **computer system**; or
(3) results in **identity theft**.

whether any of the foregoing is intentional or unintentional, malicious or accidental, fraudulent or innocent, specifically targeted at **you** or generally distributed, and regardless of whether the perpetrator is motivated for profit.

(h) **"Computer system"** means computer hardware, software, firmware, and components thereof, including electronic data stored thereon, which are linked together through a network of two or more computers, including such networks accessible through the **Internet**, intranets, extranets or virtual private networks.

(i) **"Damages"** means any amount that any **insured** shall be legally required to pay because of judgments, arbitration awards or the like rendered against an **insured**, or for settlements negotiated by **us** or by **you** in accordance with Coverage B, including, but not limited to:

(1) pre-judgment interest;
(2) post-judgment interest that accrues after entry of judgment and before **we** have paid, offered to pay or deposited in court that part of the judgment within the applicable **sublimit of liability**; and
(3) subject to this policy's other terms, conditions, exclusions and other limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts: (i) punitive, (ii) exemplary and (iii) multiple damages; provided, however, the enforceability of this Subparagraph 3(i)(3) shall be governed by such applicable law that most favors coverage for such punitive, exemplary and multiple damages.

EXHIBIT C
PAGE 500

This Definition is subject to the limitations set forth in Definition of **loss**.

(j) **"Denial of service attack"** means an attack launched by a person(s) that sends an excessive volume of electronic data to a **computer system** in order to deplete such **computer system's** capacity, and prevents those who are authorized to do so from gaining access to such **computer system** in a manner in which they are legally entitled. Provided, however, depletion in **your computer system's** capacity shall not be considered a **denial of service attack** if caused by a mistake in determining capacity needs.

(k) **"Employee"** means any past, present or future employee, including any part-time, seasonal and temporary employee, but only for **wrongful acts** committed in their capacity as such. Employee also includes any past, present or future **leased worker**, but only for **wrongful acts** committed in their capacity as such.

(l) **"Extended reporting period"** means whichever extended reporting period described in Paragraphs 9(a) through 9(c), if any, is applicable.

(m) **"Failure(s) of security"** means:

(1) the actual failure and inability of the **security** of **your computer system** to mitigate loss from or prevent a **computer attack**; or

(2) physical theft of hardware or firmware controlled by an **organization** (or components thereof) on which electronic data is stored, by a person other than an **insured**, from a premises occupied and controlled by an **organization**.

**"Failure of security"** shall also include such actual failure and inability above, resulting from the theft of a password or access code from **your** premises, **your** computer system, or an officer, director or **employee** of the **organization** by non-electronic means in direct violation of an **organization's** specific written **security** policies or procedures.

(n) **"First inception date"** means, for each Coverage Module, the date set forth in Item 4 of the Declarations as the inception date of the first errors and omissions, professional, media or other liability policy that (i) provides or provided the same or essentially the same coverage as such Coverage Module and (ii) was issued by **us** or any other member company of American International Group, Inc. ("AIG") to the **named insured** and continually renewed by **us** or any other AIG member company through the inception date of this policy; or such other date specified in Item 4 of the Declarations as such.

(o) **"Identity theft"** means the misappropriation of personal identity information of customers or members that is stored on a **computer system**, including without limitation, social security numbers, account numbers, passwords, credit card numbers, addresses or phone numbers, and that has resulted in, or could reasonably result in the wrongful or fraudulent use of such information.

(p) **"Insured"** means each (1) of **you**; and (2) **additional insured**.

(q) **"Internet"** means the worldwide public network of computers commonly known as the Internet, as it currently exists or may be manifested in the future.

(r) **"Leased worker"** means any person provided by an employment contractor or agency under an agreement between an **organization** and the employment contractor or agency to perform duties related to the conduct of an **organization's** business.

(s) **"Loss"** means the total sum of **damages** and **claim expenses**. **"Claim expenses," "damages"** and **"loss"** shall not mean and this policy shall not cover: (1) compensation, benefits, overhead, charges or expenses of any **insured** or such **insured's employees**; (2) production costs or the cost of recall, reproduction, reprinting or correction of material by any person or entity; (3) **your** cost of providing, correcting or re-performing or completing any professional services; (4) any costs or expenses incurred by any person or entity to withdraw or recall material, media, medium (including CD's, DVD's, cassettes and LP's), products (including products of others which incorporate **your** products) or professional services from the marketplace, or from loss of use arising out of such withdrawal or recall; (5) civil or criminal fines or penalties imposed against **you**; (6) taxes imposed against **you**; (7) any amounts for which an **insured** is not financially liable or which are without legal recourse to an **insured**; (8) the costs and expenses of complying with any injunctive or other form of equitable relief; (9) the monetary value of any electronic

EXHIBIT C
PAGE 501

fund transfer or transaction by an **insured** or on **your** behalf, which is lost or diminished during transfer into, out of or between an **insured's** accounts; (10) liquidated damages; and (11) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(t)  "**Malicious code**" means an unauthorized corrupting or harmful piece of code. **Malicious code** includes, but is not limited to, computer viruses, "Trojan horses," "worms," and "time or logic bombs."

(u)  "**Management control**" means: (1) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation, the management committee of a joint venture or partnership or the management board of a limited liability company.

(v)  "**Named insured**" means the entity listed as such in Item 1 of the Declarations.

(w)  "**Organization**" means (1) the **named insured**; and (2) each **subsidiary**.

(x)  "**Policy limit of liability**" means the aggregate limit of liability set forth as such in Item 3 of the Declarations.

(y)  "**Policy period**" means the period set forth as such in Item 2 of the Declarations.

(z)  "**Pollutants**" means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(aa)  "**Privacy policy**" means statements in written or electronic form regarding the collection, dissemination or treatment of information regarding customers, visitors to an **Internet** site, or other persons.

(bb)  "**Property damage**" means (1) physical injury to or loss or destruction of tangible property including the resulting loss of use thereof, and/or (2) loss of use of tangible property which has not been physically injured or destroyed provided, however, for the purpose of this definition, "tangible property" shall not include electronic data.

(cc)  "**Retroactive date**" means the respective dates set forth in the Declarations as such for each Coverage Module.

(dd)  "**Security**" means hardware, software or firmware whose function or purpose is to mitigate loss from or prevent a **computer attack**. **Security** includes, without limitation, firewalls, filters, DMZ's, computer virus protection software, intrusion detection, the electronic use of passwords or similar identification of authorized users. **Security** also includes **your** specific written policies and procedures intended to directly prevent the theft of a password or access code by non-electronic means.

(ee)  "**Sublimit of liability**" means each of the respective sublimits of liability set forth in Item 4 of the Declarations as applicable to all **loss** covered under a specific Coverage Module purchased.

(ff)  "**Subsidiary**" means:

(1) if "Blanket" has been checked in Item 1(b) of the Declarations, (a) any for-profit entity of which the **named insured** has **management control** ("**controlled entity**") on or before the inception of the **policy period** either directly or indirectly through one or more other **controlled entities**; and (b) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by an **organization**; or

(2) otherwise, the entities listed as such on an endorsement to this policy.

(gg)  "**Suit**" means a civil proceeding for monetary, non-monetary or injunctive relief which is commenced by service of a complaint or similar pleading. "**Suit**" shall also include a binding arbitration proceeding in which **damages** are alleged and to which an **insured** must submit or does submit with **our** prior written consent.

EXHIBIT C
PAGE 502

(hh) **"Trade secret"** means information (including any idea) that has been reduced to a written or electronic form, including a formula, compilation, pattern, program, device, method, process, or technique which: (1) derives independent economic value, actual or potential, from not being generally known and not being readily ascertainable through proper means by other persons who can obtain economic advantage from its disclosure or use; (2) is the subject of reasonable efforts to maintain its secrecy; and (3) is used, capable of being used, or intended to be used in commerce.

(ii) **"Transaction"** means a transaction defined as such in Paragraph 10(a) of this BASE Section.

(jj) **"Unauthorized access"** means the gaining of access to a **computer system** by an unauthorized person or persons.

(kk) **"Unauthorized use"** means the use of a **computer system** by an unauthorized person or persons or an authorized person or persons in an unauthorized manner.

(ll) **"We,"** **"us,"** **"insurer"** and **"our"** mean the insurer named in Item 7 of the Declarations.

(mm) **"Wrongful act"** means the acts, errors or omissions defined as such in the Coverage Modules of this policy.

(nn) **"You"** or **"your"** mean each and every (1) **organization** and (2) **employee** of an **organization**.

(oo) **"Your computer system"** means a **computer system** under the ownership, operation or control of an **organization**.

## 4. EXCLUSIONS

This policy does not cover any **claim**:

(a) alleging, arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law or of **your privacy policy**, or gaining of any profit or advantage to which **you** or any **additional insured** is not legally entitled, if any of the aforementioned is committed by any of **your** or any **additional insured's**:

   (1) directors, officers, trustees, governors, management committee members, members of the management board or partners (or the equivalent positions), whether acting alone or in collusion with other persons; or

   (2) **employees** (other than those referenced in sub-paragraph 4.(a)(1) above) or independent contractors employed by **you** or any **additional insured** if any of those referenced in sub-paragraph 4.(a)(1) above possessed, at any time, knowledge of any dishonest, fraudulent, malicious, or criminal acts committed by such **employee** or independent contractor that caused a direct loss to an **insured** or any other person;

(b) alleging, arising out of or resulting, directly or indirectly, from any:

   (1) purchase, sale, offer of or solicitation of an offer to purchase or sell securities, or violation of any securities law, including provisions of the Securities Act of 1933, or the Securities Exchange Act of 1934, as amended;

   (2) violation of the Organized Crime Control Act of 1970 (commonly known as "Racketeer Influenced And Corrupt Organizations Act" or "RICO"), as amended;

   (3) breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violation of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 as amended;

   (4) antitrust violations, restraint of trade, or unfair competition, or violations of the Sherman Act, the Clayton Act or the Robinson-Patman Act, as amended;

   (5) regulation promulgated under the foregoing laws; or

   (6) any federal, state, local or foreign laws (a) similar to the foregoing laws (including "Blue Sky" laws) or (b) regulating the same or similar conduct or services, whether such law is statutory, regulatory or common law;

(c) alleging, arising out of or resulting, directly or indirectly, from any employment practices or any discrimination against any person or entity on any basis, including but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, sex, sexual orientation,

EXHIBIT C
PAGE 503

(d) alleging, arising out of or resulting, directly or indirectly, from any (1) presence of **pollutants,** (2) the actual or threatened discharge, dispersal, release or escape of **pollutants,** or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **pollutants;**

(e) alleging, arising out of or resulting, directly or indirectly, from any infringement of any patent, copyright, trademark, trade dress, trade name, or service mark;

(f) alleging, arising out of or resulting, directly or indirectly, from any misappropriation of any **trade secret** by, or with active cooperation, participation, or assistance of, any **insured,** any of **your** former employees, subsidiaries, directors, officers, partners, trustees, or any of **your** successors or assignees;

(g) alleging, arising out of or resulting, directly or indirectly, from any:
    (1) false arrest, detention or imprisonment;
    (2) libel, slander or defamation of character;
    (3) wrongful entry or eviction of any physical premises; or,
    (4) malicious prosecution;

(h) alleging, arising out of or resulting, directly or indirectly, from any (1) false or deceptive **advertising** or misrepresentation in **advertising** of **your** products or services, or (2) unfair competition based on such **advertising,** including, but not limited to, **advertising** related violations of any local, state or federal consumer protection or privacy laws;

(i) against **you** that is brought by or on behalf of:

    (1) the Federal Trade Commission ("FTC"), the Department of Health and Human Services ("HHS"), the Office of Civil Rights ("OCR"), the Federal Communications Commission ("FCC") or any other federal, state or local government agency, or foreign government agency; or
    (2) the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers, Broadcast Music, Inc., or any other licensing or rights organizations in such entity's regulatory, quasi-regulatory or official capacity, functions or duties;

(j) alleging, arising out of or resulting, directly or indirectly, from any **bodily injury** or **property damage;**

(k) alleging, arising out of or resulting, directly or indirectly, from facts alleged, or to the same **wrongful acts,** or series of continuous, repeated or related **wrongful acts** alleged or contained in any **claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(l) alleging, arising out of or resulting, directly or indirectly, from any **failure of security, wrongful act,** circumstance or event committed, omitted or occurring prior to the **first inception date** if on or before the **first inception date, you** knew or could have reasonably foreseen that such **wrongful act,** circumstance or event could give rise to a **claim** against an **insured** or **loss;**

(m) alleging, arising out of or resulting, directly or indirectly, from, as of the **first inception date,** any pending or prior: (1) **claim,** demand, **suit,** arbitration, mediation or litigation, or (2) administrative, bankruptcy or regulatory proceeding or investigation, of which **you** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior **claim,** demand, **suit,** arbitration, mediation or litigation or administrative, bankruptcy or regulatory proceeding or investigation;

(n) alleging, arising out of or resulting, directly or indirectly, from any **failure of security, wrongful act** or **loss,** based upon, relating to or in connection with any act, error or omission, occurring, committed or omitted prior to the applicable **retroactive date;**

(o) alleging, arising out of or resulting, directly or indirectly, from any liability or obligation under any contract or agreement or out of any breach of contract; however, this exclusion does not apply to any liability or obligation an **insured** would have in the absence of such contract or agreement;

(p) alleging, arising out of or resulting, directly or indirectly, from any guarantee or express warranty; inaccurate, inadequate, or incomplete description of the price of goods, products or services; or any failure of goods, products or services to conform with an advertised quality or performance; or liquidated damages; or the collection of or seeking the return of fees or royalties or other compensation paid to an

6 © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 504

insured; or **your** cost of providing, correcting or re-performing or completing any services; or any **insured's** fees, cost or profit guarantees, cost representations, contract price, or estimates of probable costs or cost estimates being exceeded;

(q) alleging, arising out of or resulting, directly or indirectly, from any satellite failure;

(r) against an **insured** that is brought, directly or indirectly, by or on behalf of:

    (1) any of **you,** provided, however, this sub-paragraph (1) shall not apply to any otherwise covered **claim** made by any past, present or future **employee** or **leased worker** of the **named insured** or **subsidiary** for a **wrongful act**, but only if such **employee** or **leased worker** did not commit, participate in or contribute to such **wrongful act(s)**, or **failure of security**;

    (2) any business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by **you**; or,

    (3) any parent company, **subsidiary**, director, officer, partner, trustee, successor or assignee of **yours**, or any person or entity affiliated with **you** or such business entity through common majority ownership or control;

(s) alleging, arising out of or resulting, directly or indirectly, from:

    (1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;

    (2) strikes or similar labor action, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;

    (3) electrical or mechanical failures, including any electrical power interruption, surge, brownout or blackout; provided, however, this Subparagraph 4s(3) shall not apply to electrical or mechanical failures, other than satellite failures, where such failure was the result of **your wrongful act**; or,

    (4) any failure of telephone lines, data transmission lines or other infrastructure comprising or supporting the **Internet**, unless such lines or infrastructure were under **your** operational control;

(t) alleging, arising out of or resulting, directly or indirectly, from any of the following:

    (1) any shortcoming in **security** that **you** knew about prior to the inception of this policy;

    (2) **your** failure to take reasonable steps, to use, design, maintain and upgrade **your security**; or

    (3) the inability to use, or lack of performance of, software:  (a)  due to expiration, cancellation, or withdrawal of such software;  (b) that has not yet been released from its development stage; or (c) that has not passed all test runs or proven successful in applicable daily operations

## 5.  LIMIT OF LIABILITY (FOR ALL LOSS-INCLUDING CLAIM EXPENSES)

  (a) **General**

    (1) The aggregate **policy limit of liability** set forth in the Declarations is the most **we** will pay as **loss** under this policy, in the aggregate, for all coverages combined, regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured.**

    (2) Each **sublimit of liability** set forth in the Declarations as applicable to a specific Coverage Module is the most **we** shall pay under this policy as **loss** in respect of such Coverage Module regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured**. If two or more Coverage Modules apply to **loss** and the amount of the **sublimits of liability** differ, the most **we** will pay for **loss** covered by any single Coverage Module is the **sublimit of liability** applicable to that Coverage Module.  In any event the highest applicable **sublimit of liability** shall be **our** maximum limit of liability for all **loss** from such **claim**. Each **sublimit of liability** is part of and subject to the **policy limit of liability**. **Loss** arising out of the same **wrongful acts**, or a series of continuous, repeated or related **wrongful acts** shall be deemed to arise from the first such **wrongful act**.

    (3) The **policy limit of liability** and **sublimits of liability** for any **extended reporting period** shall be part of and not in addition to the **policy limit of liability** and respective **sublimits of liability** for the **policy period.**

7

© 2006 American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 505

(4) Further, each and every **claim** made subsequent to the **policy period** or an applicable **extended reporting period**, that pursuant to Paragraph 7(b) is considered made during the **policy period** or an **extended reporting period**, shall also be subject to the same **policy limit of liability** and respective **sublimits of liability** afforded to **claims** first made and reported during the **policy period**.

(5) **Damages, claim expenses** and **loss** are all part of and subject to the **policy limit of liability**, and the **sublimits of liability**.

## 6. RETENTION

(a) *Retention*:  For each **claim**, the **insurer** shall only be liable for the amount of **loss** arising from such **claim** that exceeds the Retention amount applicable to any Coverage Module affording coverage to such **claim**. Such Retention amounts must be borne by the **insureds** and remain uninsured with regard to all **loss**. In the event a **claim** triggers more than one Retention amount, then, as to that **claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **loss** arising from such **claim**. A single Retention amount shall apply to **loss** arising from all **claims** alleging the same **wrongful acts**, or series of continuous, repeated or related **wrongful acts**.

## 7. NOTICE AND AUTHORITY

(a) *Generally*:  Notice in connection with this policy shall be given in writing to **us** (i) in the case of **claims**, as provided in Paragraph 7(b) and (ii) in all other cases, at 175 Water Street, New York, New York c/o AIG Domestic Claims, Inc., the Financial Lines  Division.  The **named insured** shall act on behalf of each and every **insured** with respect to the giving and receiving of any notice under this policy, including, but not limited to, notice of a **claim** and notice of cancellation.  If mailed, the date of mailing shall constitute the date that such notice or information was given and proof of mailing shall be sufficient proof of notice.

(b) *Claims*:

(1) With respect to **claims** or circumstances, notice and all other information and documentation required to be provided under this policy should be directed to **us** at the address indicated in Subparagraph 7(a) above.  To be effective, such notice must reference this policy.

(2) For any and all coverage under this policy afforded on a claims first made and reported basis:

   (a) before coverage will apply, an **insured** must notify **us** in writing of a **claim** made against an **insured** as soon as practicable, but in all events no later than the end of the **policy period** or any applicable **extended reporting period**;

   (b) if an **insured** has notified **us** in writing of a **claim** pursuant to Subparagraph 7(b)(2)(a) above, then any **claim** which is subsequently made against an **insured** and reported to the **insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **claim** for which such notice has been given, or alleging any **wrongful act** which is the same as or related to any **wrongful act** alleged in the **claim** of which such notice has been given, shall be considered related to the first **claim** and made at the time such notice was given; and

   (c) if during the **policy period** or during an applicable **extended reporting period** an **insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** for a **wrongful act** that occurs prior to the end of the **policy period**, and, during the **policy period** or any applicable **extended reporting period**, an **insured** gives written notice to **us** of (i) such circumstances, (ii) the **wrongful acts** allegations anticipated and (iii) the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** that is subsequently made against an **insured** arising out of such **wrongful act** or the same **wrongful act** or series of continuous, repeated or related **wrongful acts**, shall be treated as a **claim** made against such **insured** and reported to **us** at the time such notice of such circumstances was given.

(3) For any and all coverage under this policy afforded on an occurrence basis, **you** must notify **us** in writing of any **claim** against **you** as soon as practicable.

## 8. WHAT YOU MUST DO IN THE EVENT OF A CLAIM

(a) In addition to providing notice as required in this policy, with respect to all coverages under this policy, each and every **insured** must also:

EXHIBIT C
PAGE 506

    (1)  send **us** copies of all demands, suit papers, other legal documents and invoices for **claim expenses** received by such **insured**, as soon as practicable;

    (2)  immediately record the specifics of any **claim** and the date such **insured** first received such **claim**;

    (3)  take prompt and reasonable steps to minimize the **loss** and take reasonable steps to prevent further **loss**;

    (4)  at **our** request, report such **loss** to the Federal Bureau of Investigation (FBI), a computer emergency response team (CERT), information sharing and analysis center (ISAC) or any other central reporting or investigative organization which **we** may designate;

    (5)  upon **our** request, furnish to **us** any and all documentation within such **insured's** possession; and

    (6)  give **us** and any counsel **we** select to represent an **insured** in connection with a **suit** or to investigate any **claim**, full cooperation and such information as **we** or such counsel may reasonably require, including, but not limited to, assisting **us** or such counsel in:

        (a)  any investigation of a **claim**, **loss** or other matter relating to the coverage afforded under this policy (including submission to an examination by **us** or **our** designee, under oath if required by **us**);

        (b)  making settlements;

        (c)  enforcing any legal rights **you** or **we** may have against any person or entity who may be liable to **you**;

        (d)  attending depositions, hearings and trials;

        (e)  securing and giving evidence, and obtaining the attendance of witnesses; and

        (f)  any inspection or survey conducted by **us**.

(b)  No **insured** shall admit any liability, assume any financial obligation or pay any money in connection with any **claim** without **our** prior consent. If any **insured** does, it will be at such **insured's** own expense. The foregoing sentences of this Paragraph 8(b) shall not apply to a settlement pursuant to Coverage B(4) of this policy so long as such **insured** provides **us** written notice of such settlement as soon as practicable, but in no case later than thirty (30) days after such settlement is reached in principle.

(c)  In all events, no **insured** shall take any action, or fail to take any required action, without **our** written consent, which prejudices **our** rights under this policy.

## 9.  EXTENDED REPORTING PERIOD

The following provisions are applicable solely to claims first made and reported coverages of this policy:

(a)  *Automatic Extended Reporting Period*:  If the **named insured** or the **insurer** shall refuse to renew this policy, the **named insured** shall have the right following the effective date of such nonrenewal to a period of sixty (60) days (the "**automatic extended reporting period**") in which to give written notice to **us** of **claims** first made against an **insured** during the **automatic extended reporting period** for any **wrongful act** committed prior to the end of the **policy period** and otherwise covered by this policy. The **automatic extended reporting period** shall not apply where an **extended reporting period** has been purchased or to **claims** that are covered under any subsequent insurance **you** purchase or that is purchased for **your** benefit, or that would be covered, but for the exhaustion of the amount of insurance applicable to such **claims** or that is within any applicable Retention amount.

(b)  *Optional Extended Reporting Period*:  Except as indicated below, if the **named insured** shall cancel or **we** or the **named insured** refuse to renew this policy, the **named insured** shall have the right to a period of up to three years following the effective date of such cancellation or nonrenewal (an "**extended reporting period**"), upon payment of an additional premium amount of up to two hundred percent (200%) of the full annual premium, in which to give to **us** written notice pursuant to Subparagraph 7(b)(2)(a) of the policy of **claims** (1) first made against an **insured** during said **extended reporting period** and (2) solely with respect to a **wrongful act** committed prior to the end of the **policy period** and otherwise covered by this policy. If the **named insured** exercises its right to purchase an **extended reporting period**, that period incepts at the end of the **policy period** and there shall be no **automatic extended reporting period**.

As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the **policy period**.

(c)  *Transaction Triggered Extended Reporting Period*:  In the event of a **transaction** (see Paragraph 10(a)), the **named insured** shall have the right to request an offer from **us** of an **extended reporting period** (solely with respect to pre-**transaction wrongful acts**).  Upon **our** receipt of such a request, **we** shall offer such

EXHIBIT C
PAGE 507

90592 (03/06)                       9            © 2006 American International Group, Inc. All rights reserved.

**extended reporting period** pursuant to such terms, conditions, exclusions and additional premium as **we** may decide. In the event of a **transaction**, the right to an **extended reporting period** shall not otherwise exist except as provided in this paragraph.

(d) *Common Extended Reporting Period Terms*:   An **extended reporting period** is not cancelable and the additional premium charged shall be fully earned at inception.   This Clause 9 shall not apply to any cancellation resulting from non-payment of premium.   The rights contained in this Clause 9 shall terminate unless written notice of election of an **extended reporting period** together with any additional premium due is received by **us** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **transaction**.

## 10. ORGANIZATIONAL CHANGES

(a) *Transactions*:   If during the **policy period**:

(1) the **named insured** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert shall acquire **management control** of the **named insured**;

(any of such events being a "**transaction**"), then this policy shall continue in full force and effect as to **wrongful acts** occurring prior to the effective time of the **transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **wrongful act** after the effective time of the **transaction**, unless (i) within thirty (30) days of such **transaction we** have been provided with full particulars of the **transaction**, the related entities and any other information requested by **us**, and (ii) the **named insured** or its successor, has agreed to any additional premium and amendments to this policy required by **us**.

Coverage for post-**transaction wrongful acts** is conditioned upon the **named insured** or its successor paying when due any additional premium required by **us**.   This policy may not be canceled after the effective time of a **transaction** and the entire premium for this policy shall be deemed earned as of such time.

(b) *Subsidiary Additions*:   If "Blanket" has been checked in Item 1(b) of the Declarations, **subsidiary** also includes any for-profit entity of which the **named insured** first had **management control** during the **policy period**, whether directly or indirectly through one or more other **subsidiaries**, and:

(1) whose revenues do not exceed ten percent (10%) of the gross revenues of the **organization** (as of the inception date of this policy); or

(2) whose revenues exceed ten percent (10%) or more of the gross revenues of the **organization** (as of the inception date of this policy), but such entity shall be a "**subsidiary**" only once the **named insured** shall have provided **us** with full particulars of the new **subsidiary** and agreed to any additional premium and amendments to this policy required by **us** relating to such **subsidiary**.   Further, coverage as shall be afforded to any **subsidiary** and any **employee** thereof is conditioned upon the **named insured** paying when due any additional premium required by **us** relating to such **subsidiary**.

(c) *Other Organizational Changes*:   In all events, coverage as is afforded under this policy with respect to a **claim** made against any **subsidiary** and/or any **employee** of an **organization** shall only apply for **wrongful acts** committed or allegedly committed (1) in the case of a **subsidiary**, (i) after the effective time the **named insured** obtained **management control** of such **subsidiary**, and (ii) prior to the effective time that the **named insured** no longer has **management control** over such **subsidiary**, (2) in the case of an **employee** of an **organization**, solely while such **employee** is employed by the **named insured** or a **subsidiary** over which the **named insured** has **management control**, or (3) in the case of an **employee** of an **additional insured**, solely while employed by such **additional insured**.

## 11. WHERE COVERAGE APPLIES

**We** cover **wrongful acts** that occur, **claims** that are brought and **losses** suffered anywhere in the world.

## 12. ACTIONS AGAINST US

(a) No one can sue **us**, or commence alternative dispute resolution as provided by Clause 17 of this policy, to recover under this policy unless there has been full compliance by **you** with all the terms of this policy.

EXHIBIT C
PAGE 508

     © 2006 American International Group, Inc.  All rights reserved.

(b)  A person or organization may sue **us** to recover up to the **policy limits of liability** or any applicable **sublimit of liability** under this policy, whichever would be exhausted first, only after liability of all **insureds** has been decided by:

    (1)  an arbitration award as a result of arbitration commenced in accordance with Clause 17 of this policy;

    (2)  a trial or appeal, after which a final judgment has been entered; or

    (3)  a written agreement signed by **you**, **us** and the party making the **claim**.

(c)  Any person, organization or legal representative thereof who has secured such award, judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.  **We** may not be impleaded by any natural person **insured**, his or her spouse, any other **insured** or any legal representative of the foregoing.

## 13. SUBROGATION

**You** may be able to recover all or part of a **claim** or a **loss** from someone other than **us**. **You** may waive **your** rights to recovery against others as long as **you** do so in writing before the **loss** occurs.  **You** must do all that is possible after a **claim** or **loss** to preserve any, and all, rights of recovery. As a condition of any payment by **us** under this policy, **your** rights to recovery will be transferred to **us**.  **You** will do whatever is necessary, including signing documents, to help **us** obtain that recovery.

## 14. OTHER INSURANCE

Except as otherwise stated to the contrary elsewhere in the policy, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance available to any **insured** unless such other insurance is written only as specific excess insurance over the **policy limit of liability** provided by this policy.

## 15. CANCELLATION

(a)  *By **Named Insured***:  This policy may be canceled by the **named insured** at any time only by mailing written prior notice to **us** or by surrender of this policy to **our** authorized agent or **us**.

(b)  *By Us*: This policy may be canceled by **our** delivering to the **named insured** by registered, certified, other first class mail or other reasonable delivery method, at the address of the **named insured** set forth in the Declarations, written notice stating when, not less than sixty (60) days thereafter (ten (10) days in the event of cancellation for non-payment of premium), the cancellation shall be effective. Proof of mailing or delivery of such notice as aforesaid shall be sufficient proof of notice and this policy shall be deemed canceled as to all **insureds** at the date and hour specified in such notice.

(c)  *Return of Premium*:  **We** shall have the right to the premium amount for the portion of the **policy period** during which the policy was in effect.  If this policy shall be canceled by the **named insured**, **we** shall retain the customary short rate proportion of the premium herein.

## 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without **our** prior written consent.

## 17. ALTERNATIVE DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **loss**, shall be submitted to the alternative dispute resolution ("ADR") process set forth in this clause.

Either **you** or **we** may elect the type of **ADR** process discussed below; provided, however, that **you** shall have the right to reject **our** choice of the type of **ADR** process at any time prior to its commencement, in which case **your** choice of **ADR** process shall control.

There shall be two choices of **ADR** process: (1) non-binding mediation administered by any mediation facility to which **we** and **you** mutually agree, in which all implicated **insureds** and **we** shall try in good faith to settle the dispute by mediation under or in accordance with the then-prevailing commercial mediation rules; or (2) arbitration submitted to an arbitration panel of three (3) arbitrators.   The **insureds** shall select one (1) arbitrator, **we** shall select one (1) arbitrator and said arbitrators shall mutually agree upon the third c

EXHIBIT C
PAGE 509

© 2006 American International Group, Inc.  All rights reserved.

the third arbitrator.  In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The dispute or differences considered by the mediator or arbitrators shall be governed by the internal laws of the State of New York; provided, however, that New York law shall not apply to:

(a) procurement, issuance or delivery of this policy, including cancellation or nonrenewal provisions of this policy (if any) or any other New York State regulations or requirements regarding policies issued pursuant to New York State Insurance Law; or

(b) to the determination of the availability of punitive damages, unless New York law otherwise applies.

In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs.  In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 120 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the **ADR** process.

Either choice of **ADR** process may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1(a) of the Declarations as the mailing address for the **named insured**.  The **named insured** shall act on behalf of each and every **insured** in connection with any **ADR** process under this clause.

## 18. BANKRUPTCY

Bankruptcy or insolvency of any **insured** shall not relieve the **insurer** of any of its obligations hereunder.

## 19. SPOUSAL AND LEGAL REPRESENTATIVE EXTENSION

If a **claim** against a natural person **insured** includes a **claim** against: (a) the lawful spouse of such **insured**; or (b) a property interest of such spouse, and such **claim** arises from any actual or alleged **wrongful act** of such **insured**, this policy shall cover **loss** arising from the **claim** made against that spouse or the property of that spouse to the extent that such **loss** does not arise from a **claim** for any actual or alleged act, error or omission of such spouse.  This policy shall cover **loss** arising from a **claim** made against the estates, heirs, or legal representatives of any deceased natural person **insured**, and the legal representatives of any natural person **insured**, in the event of incompetency, insolvency or bankruptcy, who was an **insured** at the time the **wrongful acts** upon which such **claim** is based were committed.

## 20. APPLICATION

All the statements and representations in the **application** are deemed to be material to the risk assumed by the **insurer**, form the basis of this policy and are incorporated into and have become a part of this policy.

## 21. POLICY CHANGES

This policy contains all the agreements between **you** and **us** concerning this insurance. This policy can only be changed by a written endorsement **we** issue and make a part of this policy.

## 22. SPECIAL RIGHTS AND DUTIES OF NAMED INSURED

**You** agree that when there is more than one natural person or entity covered under this policy, the **named insured** first listed in Item 1 of the Declarations shall act on behalf of all **insureds** as to:

(a)    giving and receiving notice, including, but not limited to, notice of **claims** and cancellation;

(b)    the exercising or declining of any right to an **extended reporting period**;

(c)    the resolution of any dispute in connection with coverage afforded or purportedly afforded by this policy;

(d)    payment of premiums and receipt of return premiums, if any; and

(e)    acceptance of any endorsements or other changes to this policy.

## 23. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

EXHIBIT C
PAGE 510

24.  **SERVICE OF SUIT**

Subject to Clause 17, it is agreed that in the event of **our** failure to pay any amount claimed to be due under this policy, **we**, at the request of any **insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America. Nothing in this Clause constitutes, or should be understood to constitute, a waiver of **our** rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States of America or of any state in the United States of America.  It is further agreed that service of process may be made upon General Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street New York, NY 10270, or his or her representative, and that in any **suit** instituted against **us** upon this contract, **we** will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States of America which makes provision therefore, **we** hereby designate the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as **our** true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of any **insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

EXHIBIT C
PAGE 511



# AIG netAdvantage®

## SECURITY & PRIVACY LIABILITY MODULE

### 1. MODULAR FORMAT

This SECURITY & PRIVACY LIABILITY Module is a part of an AIG netAdvantage policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules. This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above. The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module. THIS COVERAGE MODULE IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS.

### 2. MODIFIED DEFENSE OF INSUREDS

Clause 2, Coverage B of the BASE Section, is hereby amended by appending the following paragraph to the end of that Clause:

(6) **Regulatory Actions**: **We** have the right, but not the duty, to defend any **regulatory action**. **We** shall pay for **claim expenses** any **insured** incurs with **our** prior written consent in the defense of a **regulatory action** for covered **wrongful acts**.

### 3. BASE DEFINITIONS

Solely with respect to the coverage afforded under this Coverage Module only, the Definition Paragraphs 3(e) (**claim**), 3(o) (**identity theft**), 3(aa) (**privacy policy**) and 3(gg) (**suit**) of the BASE Section are deleted in their entirety and replaced, respectively, with the following:

(e) "**Claim**" means:
    (1) a written or oral demand for money, services, non-monetary relief or injunctive relief;
    (2) a **suit**; or,
    (3) a **regulatory action**.

(o) "**Identity theft**" means the misappropriation of **private information** that has resulted in, or could result in the wrongful or fraudulent use of such information, including without limitation, fraudulently emulating the identity of an individual or corporation.

(aa) "**Privacy policy**" means the organization's policies and practices intended to protect the confidentiality of **private information**, including without limitation, statements in written or electronic form regarding the collection, dissemination or treatment of **personally identifiable information**.

(gg) "**Suit**" means a civil proceeding for monetary, non-monetary or injunctive relief that is commenced by service of a complaint or similar pleading; provided, however, **suit** shall not include a **regulatory action**. **Suit** shall also include a binding arbitration proceeding in which **damages** are alleged and to which **you** must submit or do submit with **our** prior written consent.

### 4. MODULE DEFINITIONS

SL(a) "**Class action claim**" means any **claim** arising out of a **wrongful act** which resulted in a **privacy peril**:
    (1) brought on behalf of a class or putative class of plaintiffs (whether or not certified as such)

1 © 2005 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 512

(2) otherwise brought on a representative basis; or

(3) alleging or arising from the same **wrongful act** or a series of continuous, repeated or related **wrongful acts** as any **claim** described in the preceding subparagraphs SL(a)(1) or SL(a)(2).

SL(b)  **"Confidential corporate information"** means any **trade secret**, data, design, interpretation, forecast, formula, method, practice, process, record, report or other item of information of a non-**insured** third party, and which is (i) in **your** care, custody or control;  (ii) not available to the general public, and is: (iii) provided to **you** under a mutually agreed to written confidentiality/non-disclosure agreement; or (iv) marked "confidential" or otherwise specifically designated in writing as "confidential" by such third party.

SL(c)  **"Information holder"** means a third party that **you** have provided **personally identifiable information** to and with whom **you** have entered into a contract that requires such party to protect such personally identifiable information.

SL(d)  **"Material"** means content in any form, including written, printed, video, electronic, digital, or digitized content:

(1) in broadcasts, including, but not limited to, television, motion picture, cable, satellite television and radio broadcasts;

(2) in publications, including, but not limited to, newspaper, newsletter, magazine, book and other literary, monograph, brochure, directory, screen play, film script, playwright and video publications;

(3) in **advertising**;  or

(4) displayed on an **Internet** site.

SL(e)  **"Personally identifiable information"** means any of the following in **your** care, custody or control: (1) information from which an individual may be uniquely and reliably identified or contacted, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords; (2) information concerning an individual that would be considered "nonpublic personal information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) (as amended) and its implementing regulations; and (3) information concerning an individual that would be considered "protected health information" within Health Insurance Portability and Accountability Act of 1996 (as amended) and its implementing regulations.

SL(f)  **"Privacy peril"** means any actual or alleged:

(1) unauthorized disclosure by **you** of **private information** or failure by **you** to protect **private information** from misappropriation, including, without limitation, any unintentional violation of **your privacy policy** or misappropriation that results in **identity theft**;

(2) failure by an **information holder** to protect **personally identifiable information** from misappropriation, provided that any failure to protect such information shall not include any intentional, dishonest, fraudulent, criminal or malicious act, error or omission if committed by:

(i)   the **information holder**;

(ii)  any elected or appointed officer, or director of the **information holder**; or,

(iii) any employee (other than officers) or independent contractors employed by an **information holder** if any elected or appointed officer of an **information holder** possessed, at any time, knowledge of the intentional, dishonest, fraudulent, criminal or malicious act committed by such employee or independent contractor that caused a direct loss to an **insured** or any other person.

EXHIBIT C
PAGE 513

2   © 2005 American International Group, Inc.  All rights reserved.

(3) failure by **you** to disclose or warn of an actual or potential **identity theft**, but only if such **identity theft** resulted directly from SL(f)(1) or SL(f)(2) above; or

(4) violation of any federal, state, foreign or local privacy statute alleged in connection with a **claim** for **damages** from SL(f)(1), SL(f)(2) or SL(f)(3) above.

SL(g)   "**Private information**" means:

(1) **personally identifiable information**; or

(2) **confidential corporate information.**

SL(h)   "**Regulatory action**" means a request for information, civil investigative demand or civil proceeding commenced by service of a complaint or similar pleading, brought by, or on behalf of, a governmental agency that alleges a **privacy peril** as defined in sub-paragraph SL (f)(4) of the definition of **privacy peril**, which may reasonably be expected to give rise to a covered suit.

SL(i)   "**Wrongful act**" means any actual or alleged breach of duty, neglect, act, error or omission that results in a **failure of security**; or a **privacy peril.**

## 5.   BASE EXCLUSIONS

Exclusions in Paragraphs 4(i) (regulatory actions), and, 4(o) (contractual liability), of the BASE Section are not applicable to this Coverage Module.

## 6.   MODULE EXCLUSIONS

Under this Coverage Module, **we** will not cover any **claim**, **wrongful act** or **loss** alleging, arising out of or resulting, directly or indirectly, from:

SL(a)   any liability or obligation under any contract or agreement, including, without limitation, any contract price, cost guarantee or cost estimate being exceeded; however, this exclusion does not apply to:

(1) liability **you** would have in the absence of such contract or agreement; or

(2) with respect to a **privacy peril**, any liability or obligation under a confidentiality or non-disclosure agreement;

SL(b)   against **you** that is brought by or on behalf of:

(1) the Federal Trade Commission ("FTC"), the Department of Health and Human Services ("HHS"), the Office of Civil Rights ("OCR"), the Federal Communications Commission ("FCC") or any other federal, state or local government agency, or foreign government agency provided, in accordance with subparagraph 2.B(6) of the policy but notwithstanding subparagraphs 3.s(5) and 3.s(6), this subparagraph SL(b)(1) shall not apply to any **claims expenses** arising out of a covered **regulatory action**; or

(2) the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers, Broadcast Music, Inc., or any other licensing or rights organizations in such entity's regulatory, quasi-regulatory or official capacity, functions or duties;

SL(c)   With respect to a **privacy peril**:

(1) the collection of **private information**, including, without limitation (i) such collection by means of electronic "cookies", "spiders", spybots, spambots, spyware, adware, wire-tapping, **malicious code**, key-stroke logging, tracking devices, radio frequency identification tags (RFID tags), bugging or video camera; or (ii) the failure to provide adequate notice regarding: (a) the purpose for the

90599 (03/06)                                    3      © 2005 American International Group, Inc.   All rights reserved.

EXHIBIT C
PAGE 514

private information is collected and used; (b) contact information for inquiries or complaints; (c) those parties to which the **private information** could be disclosed to; (d) "opt out" choices of the individual or entity from whom **you** are collecting the **private information**; or (e) the means **you** offer for limiting use or disclosure of the **private information**; provided, however, that this exclusion shall not apply to any otherwise covered **claim** for a **wrongful act** that resulted in a **privacy peril**.

(2) the integrity of **private information**, including whether the **private information** is: (i) relevant and reliable for the purpose for which it is collected or to be used; (ii) accurate; (iii) complete; or (iv) current;

(3) **your** provision of, or failure to provide, access to **private information** to those individuals or entities with an actual or alleged right to such access, including, without limitation, failing to provide an individual or entity the ability to correct, amend or delete **private information**;

(4) **your** distribution of unsolicited marketing, e-mail or **advertising**, including without limitation unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, "pop-up" or "pop-under" **Internet** advertising or fax-blasting, direct mailing or telemarketing; provided, however, this exclusion shall not apply to any **claim** for a **wrongful act** that resulted in a **privacy peril**;

(5) **your** distribution, creation, exhibition, performance, preparation, printing, production, publication, release, display, research or serialization of any **material**, including without limitation, any such **claim** covered under Clause, 2., Coverage A of the BASE Section; or

## 7. REGULATORY ACTION SUBLIMIT OF LIABILITY

Clause 5, paragraph (a) of the BASE Section, is hereby amended by appending the following subparagraph to the end of that Clause:

(6) The **regulatory action limit of liability** set forth in Item 5 of the DECLARATIONS of this Policy is the most **we** will pay as **claim expenses** under this policy, in the aggregate, for all **regulatory actions** combined, regardless of the number of persons, occurrences, **regulatory actions** or entities covered by this policy, or claimants or **regulatory actions** brought against any **insured**. The **regulatory action limit of liability** is part of and subject to the **policy limit of liability** and the **sublimit of liability** for SECURITY & PRIVACY LIABILITY.

## 8. SPECIAL CLASS ACTION RETENTION

For each **class action claim** arising out of a **wrongful act(s)** which resulted in a **privacy peril**, the **insurer** shall only be liable for the amount of **loss** arising from such **class action claim** that exceeds the applicable Retention amount for such **claim**.  Accordingly, the Retention amount for each **class action claim** shall be the greater of one hundred thousand dollars ($100,000) or two hundred percent (200%) of the Retention amount set forth in Item 4. of the Declarations for SECURITY & PRIVACY LIABILITY.

<End of Module>

© 2005 American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 515



**AIG netAdvantage®**

## MULTIMEDIA MODULE
### MEDIA LIABILITY INSURANCE

### 1. MODULAR FORMAT

This MULTIMEDIA Module is a part of an AIG netAdvantage policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules.  This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above.  The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.  THIS COVERAGE MODULE IS WRITTEN ON AN OCCURRENCE BASIS.

### 2. BASE INSURING CLAUSES

Clause 2. Insuring Agreements, the paragraph preceding Coverage A and Coverage A of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

### 3. MULTIMEDIA MODULE INSURING CLAUSE (Occurrence Based)

**We** shall pay on **your** behalf those amounts, in excess of the applicable Retention, **you** or any **additional insureds** are legally obligated to pay, including liability **assumed under contract**, as **damages** resulting from any **claim** made against **you** or such **additional insured** for **your wrongful acts**;  provided that such **wrongful act(s)** first occur during the **policy period**, regardless of when such **claim** is made or a **suit** is filed.

### 4. BASE DEFINITIONS

With respect to the coverage afforded under this Coverage Module only, Definition Paragraph 3(a) (**additional insured**) of the BASE Section is hereby deleted and replaced with the following:

(a) **"Additional insured"** shall mean:

   (1) any independent contractors, agents, third-party distributors, licensees and sub-licensees who assist in the performance, dissemination or distribution of **material**, but solely where an **organization** has, prior to the commission of a **wrongful act**, expressly agreed in writing to indemnify and defend such third party of and from liability arising out of such **wrongful act**, and

   (2) any other person or entity listed as an **"additional insured"** by endorsement to this Coverage Module or to the BASE Section.

With respect to the coverage afforded under this Coverage Module only, Definition Paragraph 3(p) (**insured**) of the BASE Section is hereby deleted and replaced with the following:

(p) **"Insured"** means each (1) of **you**; and (2) any **additional insured.**

With respect to the coverage afforded under this Coverage Module only, Definition Paragraph 3(nn) (**you or your**) of the BASE Section is hereby deleted and replaced with the following:

(nn) **"You"** or **"your"** means each and every:

   (1) **organization;**

   (2) **employee** of an **organization**, but only while acting within the scope of his or her duties as such in the provision of **material** for such **organization**; and

   (3) **additional insured**, but only while acting within the scope of his or her duties as such in the provision, dissemination or distribution of **material** for an **organization.**

### 5. MODULE DEFINITIONS

MEDIA (a)  **"Assumed under contract"** means liability for **damages** from a **wrongful act** where such liability has

90597 (03/06)                                           1                    © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 516

been assumed by **you** in the form of a written hold harmless or indemnity agreement that predates the first such **wrongful act.**

MEDIA (b) **"Content"** means written, printed, video, electronic, digital, or digitized images, sounds, text, music, descriptions and information.

**"Content"** does not include:

(1) the actual goods, products or services described, illustrated or displayed in media **content;**

(2) any software or code that is intended to: (i) control the functioning of computer hardware or electronic controls, or (ii) process data or information; or

(3) **your** trademark or trade name.

MEDIA (c) **"Covered peril"** means any:

(1) infringement of copyright, title, slogan, trademark, trade name, trade dress, mark, service mark or service name, including without limitation infringement of domain name, deep-linking or framing; plagiarism, piracy or misappropriation of ideas under implied contract or other misappropriation of property rights, ideas or information; or any alleged violation of Section 43(a) of the Lanham Act or any similar state statutes; including without limitation unfair competition in connection with a **claim** for **damages** in connection with such conduct;

(2) form of invasion, infringement or interference with rights of privacy or publicity, including, but not limited to false light, public disclosure of private facts, intrusion and commercial appropriation of name, persona or likeness; including without limitation emotional distress or mental anguish alleged in connection with a **claim** for **damages** in connection with such conduct;

(3) form of defamation or other tort related to disparagement or harm to character, reputation or the feelings of any person, including, but not limited to, libel, slander, product disparagement, trade libel; including without limitation unfair competition, emotional distress or mental anguish alleged in connection with a **claim** for **damages** in connection with such conduct;

(4) wrongful entry or eviction, trespass, eavesdropping or other invasion of the right to private occupancy, including without limitation emotional distress or mental anguish alleged in connection with a **claim** for **damages** in connection with such conduct; or

(5) false arrest, detention or imprisonment or malicious prosecution, including without limitation emotional distress or mental anguish alleged in connection with a **claim** for **damages** in connection with such conduct.

MEDIA (d) **"Each loss"** means all **loss** arising out of a single broadcast, creation, distribution, exhibition, performance, preparation, printing, production, publication, release, display, research or serialization of **material,** or multiple broadcasts, creations, distributions, exhibitions, performances, preparations, printings, productions, publications, releases, displays, research or serializations of **material,** or any combination of the foregoing, on one or more dates relating to the same subject, person or class of persons, without regard to the number of repetitions, modifications, alterations or forms of such utterance, dissemination, service or **advertising.**

MEDIA (e) **"Material"** means **content:**

(1) in broadcasts, including, but not limited to, television, motion picture, cable, satellite television and radio broadcasts;

(2) in publications, including, but not limited to, newspaper, newsletter, magazine, book and other literary form, monograph, brochure, directory, screen play, film script, playwright and video publications;

(3) in **advertising;** or

(4) displayed on an **Internet** site.

MEDIA (f) **"Web log"** means any diary, commentary, or observation published on an **Internet** site.

MEDIA (g) **"Wrongful act"** means, solely in the broadcast, creation, distribution, exhibition, performance, preparation, printing, production, publication, release, display, research or serialization of material by **you,** any actual or alleged act, error, omission, breach of duty, misstatement or misleading

EXHIBIT C
PAGE 517

statement, first occurring during the **policy period**, which results in:

(1)  any **covered peril**; or

(2)  **loss** because a third party, which has no ownership relationship with **you**, acts upon or makes a decision or decisions based on the content of the **material** disseminated by **you** or with **your** permission.

## 6.  BASE EXCLUSIONS

The Exclusions in: Subparagraph 4(b)(4) (antitrust and unfair competition), Paragraph 4(e) (intellectual property), 4(f)(trade secrets), 4(g)(2)(libel, slander, defamation), 4(n) (**retroactive date**) and 4(o) (contractual liability) of the BASE Section are not applicable to this Coverage Module.

## 7.  MODULE EXCLUSIONS

This Coverage Module shall not cover any **claim**:

MEDIA (a)  alleging, arising out of or resulting, directly or indirectly, from: (1) accounting practices or the determination of contingent compensation; or (2) licensing fees or royalties ordered, directed or agreed to be paid by **you** pursuant to a judgment, arbitration award, settlement agreement or similar order or agreement, for the continued use of a person or entity's copyright, title, slogan, trademark, trade name, trade dress, service mark, service name, or other protected property right;

MEDIA (b)  alleging, arising out of or resulting, directly or indirectly, from any patent infringement or theft, misappropriation, copying, display or publication of any **trade secret**, or from any infringement of copyright, trademark or servicemark of software or software technology;

MEDIA (c)  against **you** by any independent contractor, joint venturer, venture partner, any **employee** of the forgoing or any **employee** of **yours** alleging, arising out of or resulting, directly or indirectly, from disputes over the (1) ownership or exercise of rights in **material** or (2) services supplied by such independent contractor, joint venturer, venture partner or **employee**;

MEDIA (d)  alleging, arising out of or resulting, directly or indirectly, from any actual or alleged **computer attack**;

MEDIA (e)  alleging, arising out of or resulting, directly or indirectly, from any liability or obligation under any contract or agreement or out of any breach of contract; however, this exclusion does not apply to:

(1)  liability or obligation **you** or an **insured** would have in the absence of such contract or agreement;

(2)  liability to an **additional insured** agreed to in accordance with subparagraph (1) of the definition of **additional insured**;  or

(3)  liability **assumed under contract**;

MEDIA (f)  alleging, arising out of or resulting, directly or indirectly, from antitrust violations, restraint of trade, unfair competition, or violations of the Sherman Act, the Clayton Act or the Robinson-Patman Act, as amended; or any regulation promulgated under the foregoing laws, or any federal, state, local or foreign laws (a) similar to the foregoing laws or (b) regulating the same or similar conduct or services, whether such law is statutory, regulatory or common law;  provided, however, this sub-paragraph shall not apply to unfair competition as referenced in the definition of **covered peril**;

MEDIA (g)  alleging, arising out of or resulting, directly or indirectly, from any **wrongful act**, related **wrongful acts** or series of continuous or repeated **wrongful acts** where the first such **wrongful act** first occurs prior to the inception of or subsequent to the termination of the **policy period**;

MEDIA (h)  alleging, arising out of or resulting, directly or indirectly, from the uploading or downloading of digitized music, movies, software or video games by persons who allegedly or actually failed to obtain valid licenses with respect to such music, movies, software or video games; or

MEDIA (i)  alleging, arising out of or resultubg, directly or indirectly, from **material** that individuals post on a **web log**; provided, however, this exclusion shall not apply to **material** (a) on **your Internet** site or any **Internet** site hosted by **you** that has been reviewed and approved prior to posting by legal counsel qualified and versed in clearance procedures for media or (b) that **you** or individuals acting under **your** direction post on a **web log** on any **Internet** site that has been reviewed and approved

EXHIBIT 9
PAGE 518

prior to posting by legal counsel qualified and versed in clearance procedures for media.

8. **EACH LOSS**

This Coverage Module shall afford coverage solely to **each loss** arising out of a **wrongful act**, related **wrongful acts** or series of continuous or repeated **wrongful acts** where the first such **wrongful act** first occurs during the **policy period.** A single Retention amount shall apply to **each loss** covered under this Coverage Module.

9. **ASSISTANCE AND COOPERATION**

In addition to the requirements of Clause 8. **WHAT YOU MUST DO IN THE EVENT OF A CLAIM** of the BASE Section, each **insured** shall take such actions that, in such **insured's** reasonable judgment, are deemed necessary and practicable to prevent, discontinue or limit the utterance or dissemination of **material** that is erroneous, false, or untrue.

<End of Module>

EXHIBIT C
PAGE 519



# AIG netAdvantage®

## INFORMATION ASSET MODULE
### FIRST PARTY INFORMATION ASSET INSURANCE

**1. MODULAR FORMAT**

This INFORMATION ASSET Module is a part of an AIG netAdvantage policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules. This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above. The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.

**2. BASE INSURING CLAUSES**

Clause 2. Insuring Agreements, (i) the paragraph preceeding Coverage A, (ii) Coverage A and (iii) Coverage B, of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

**3. INFORMATION ASSET MODULE INSURING CLAUSE**

**We** shall pay an **organization** the actual **information asset loss** that such **organization** sustains, in excess of the applicable Retention, resulting directly from **injury** to **information assets** first occurring during the **policy period**. Such **information asset loss** must first occur during the **policy period** and result from a **failure of security** of **your computer system** that also first occurs during the **policy period**.

**4. BASE DEFINITIONS**

Solely with respect to the coverage afforded under this Coverage Module only, the definitions of the BASE Section are hereby deleted and replaced, or amended (as applicable) as follows:

"**Loss**" is amended by replacing the first sentence entirely and the lead-in language of the second sentence as follows:

"**Loss**" means the total sum of any **information asset loss**. However, "**loss**" and "**information asset loss**," shall not mean, and this policy shall not cover:

**5. MODULE DEFINITIONS**

IA (a)  "**Failure(s) of security**" means the actual failure and inability of the **security** of **your computer system** to mitigate loss from or prevent a **computer attack**. "**Failure of security**" shall also include such actual failure and inability above, resulting from the theft of a password or access code by non-electronic means in direct violation of an **organization's** specific written **security** policies or procedures.

IA (b)  "**Information assets**" means the:

    (1) software or electronic data, including without limitation, customer lists and information, financial, credit card or competitive information, and confidential or private information, stored electronically on **your computer system**, which is subject to regular back-up procedures; or

    (2) capacity of **your computer system**, including without limitation, memory, bandwidth, or processor time, use of communication facilities and any other computer-connected equipment.

IA (c)  "**Information asset loss**" means:

    (1) with respect to **information assets** described in Clause 5. **MODULE DEFINITIONS**, paragraph IA(b)(1) that are altered, corrupted, destroyed, disrupted, deleted or damaged, the actual and necessary costs an **organization** incurs to **restore** its **information assets**; provided, however:

        (a) if an **organization** cannot **restore** such **information assets**, but can **recollect** such **information assets**, then **information asset loss** shall mean only the actual cost an **organization** incurs to

1

© 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 520

recollect such **information assets**; and

    (b) if an **organization** cannot **restore** or **recollect** such **information assets**, then **information asset loss** shall mean only the actual cost **an** organization incurs to reach this determination;

(2) with respect to **information assets** described in Clause 5. **MODULE DEFINITIONS**, paragraph IA(b)(1) that are copied, misappropriated, or stolen, including without limitation any **information assets** that are **trade secrets, information asset loss** means the stated value set forth for each scheduled information asset as endorsed to this policy (if applicable); or

(3) with respect to **information assets** described in Clause 5. **MODULE DEFINITIONS**, paragraph IA(b)(2) that are misappropriated or stolen, the actual cash value an **organization** paid for such lost capacity of **your computer system**, which would not have been paid for by an **organization**, but for such misappropriation or theft.

However, **information asset loss** shall not mean, and there shall be no coverage under this Coverage Module for: (1) loss arising out of any liability to third-parties for whatever reason; (2) legal costs or legal expenses of any type; (3) costs or expenses **you** incur to update, upgrade, enhance or replace **your information assets** to a level beyond that which existed prior to sustaining **loss**; (4) loss arising out of any physical damage to or destruction of the computer hardware, firmware or any other property except **information assets**; (5) that part of any **information asset loss**, for which the proof as to its existence or amount is solely dependent on: (i) an inventory computation or comparison; or (ii) a profit and loss computation or comparison; provided, however, where the **insured** establishes wholly apart from such comparison that it has sustained a **information asset loss**, then it may offer its inventory records and actual physical count of inventory in support of the amount of such **information asset loss** claimed; (6) the cost or expenses **you** incur for researching or developing **information assets**, including without limitation **trade secrets**; provided, however that this subparagraph shall not apply to the stated value of **information assets** scheduled by endorsement (if applicable); (7) the economic or market value of, or the monetary value of lost market share, profits, or royalties related to, any **information assets**, including without limitation **trade secrets**; provided, however that this subparagraph shall not apply to the stated value of **information assets** scheduled by endorsement (if applicable); (8) costs or expenses **you** incur to identify and remove software program errors or vulnerabilities; or (9) the monetary value of any electronic fund transfers or transactions by **you** or on **your** behalf, which is lost, diminished or damaged during transfer from, into or between **your** accounts. This definition is subject to the limitations set forth in the Definition of **loss**, as such term is defined in Clause 2. **DEFINITIONS**, paragraph (t) of the BASE Section and amended in this Coverage Module.

IA (d)  **"Injury"** means: (1) alteration, corruption, destruction, disruption, deletion, or damage; or (2) copying, misappropriation or theft.

IA (e)  **"Restore"** means costs or expenses to restore **information assets** from any collection of partially or fully matching electronic data or software, or through electronic data or disaster recovery methods.

IA (f)  **"Recollect"** means costs or expenses to: (a) recollect the information making up the **information asset**, including without limitation, information from non-electronic sources; and (b) organize and transcribe such information into the same or substantially similar form as the original **information asset**.

## 6.  BASE EXCLUSIONS

The Exclusions set forth in Clause 4 of the BASE Section are not applicable to this Coverage Module, except for the following paragraphs: 4(a) (dishonest acts); 4(d) (pollution exclusion); 4(j) (**bodily injury/property damage** exclusion); 4(f) (**trade secrets**); 4(l) (first inception); 4(q)(satellite exclusion); 4(s) (physical damage exclusion); and, 4(t) (known shortcomings exclusion)

## 7.  MODULE EXCLUSIONS

This Coverage Module shall not cover any **failure of security** or **information asset loss**:

IA (a)  arising out of or resulting, directly or indirectly, from any circumstance or occurrence that has been

© 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 521

reported to an insurer on, or is covered under, any other policy of insurance effective prior to the inception date of this policy; or alleging or arising out of the same **failure of security** or series of continuous, repeated or related **failures of security** or alleging the same or similar facts, alleged or contained in any claim that has been reported, or any **failure of security** of which notice has been given, under any policy of which this policy is a replacement or succeeds in time;

IA (b)   arising out of or resulting, directly or indirectly, from any seizure, confiscation, nationalization, or destruction of **your computer system** or information assets by order of any governmental or public authority; or

IA (c)   arising out of or resulting, directly or indirectly, from any wear and tear or gradual deterioration of **your computer system** or **information assets.**

8.  **LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING CLAIMS EXPENSES):**  Solely with respect to the coverage afforded under this Coverage Module, in Clause 5. **LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING CLAIMS EXPENSES)** of the BASE Section, paragraph (a), subsections (2) and (5) are deleted in their entirety and replaced with the following:

(2)  Each **sublimit of liability** set forth in the Declarations as applicable to a specific Coverage Module is the most **we** shall pay under this policy as **loss** in respect of such Coverage Module regardless of the number of persons, occurrences, **claims, failures of security** or entities covered by this policy, or claimants or **claims** brought against any **insured.**

If two or more Coverage Modules apply to **loss** and the amount of the **sublimits of liability** differ, the most **we** will pay for **loss** covered by any single Coverage Module is the **sublimit of liability** applicable to that Coverage Module.  In any event the highest applicable **sublimit of liability** shall be **our** maximum limit of liability for all **loss** from such **failure of security.**

With respect to this Coverage Module, **our** total liability for all **loss** arising from any and all **failures of security** first occurring during the **policy period** or any applicable **extended reporting period,** alleging any **failure of security** or series of continuous, repeated or related **failures of security** shall not exceed the applicable **sublimit of liability,** subject to the following:

**our** total liability for **information asset loss** arising from each covered **failure of security** resulting in the theft, misappropriation, or copying of any **information asset,** shall be the amount set forth by specific endorsement, if applicable, for each such **information asset.**  In the event no such endorsement is attached, **our** limit of liability for such **information asset loss** shall be zero.

**Loss** or a **failure of security** arising out of the same **failures of security,** or a series of continuous, repeated or related **failures of security** shall be deemed to arise from the first such **failure of security.**

(5)  **Information asset loss** is part of and subject to the **policy limit of liability** and the applicable **sublimit of liability** in this policy.

9.  **RETENTION:** Solely with respect to the coverage afforded under this Coverage Module, in Clause 6. **RETENTION** of the BASE Section, paragraph (a) is deleted in entirety and replaced with the following:

(a)  *Retention*:  For each **failure of security,** the **insurer** shall only be liable for the amount of **loss** arising from such **failure of security** that exceeds the Retention amount applicable to this Coverage Module affording coverage for such **failure of security.** Such Retention amounts must be borne by the **insureds** and remain uninsured with regard to all **loss.**  In **our** sole and absolute discretion, **we** may advance all or part of the applicable Retention amount in which case **you** agree to repay **us** immediately after **we** notify **you** of that payment.

10. **RETENTION:**  Solely with respect to the coverage afforded under this Coverage Module, Clause 6. **RETENTION** of the BASE Section is hereby amended by appending the following to the end of that paragraph:

(b)  With respect to this Coverage Module, the Retention applies to each **failure of security** or series of continuous, repeated or related **failures of security** and **you** may not insure it.

   © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 522

11. **NOTICE AND AUTHORITY:**   Solely with respect to the coverage afforded under this Coverage Module, Clause 7. **NOTICE AND AUTHORITY**, paragraph (a) of the BASE Section, is deleted in entirety and replaced with the following:

(a) *Information Asset Coverage Module*.  **You** must notify **us** in writing of **your information asset loss** as soon as practicable, but in all events either within the **policy period** or **extended reporting period** (if applicable).

12. **WHAT YOU MUST DO IN THE EVENT OF A LOSS UNDER THIS COVERAGE MODULE**

In addition to the applicable items in Clause 7. **NOTICE AND AUTHORITY** and Clause 8. **WHAT YOU MUST DO IN THE EVENT OF A CLAIM** of the BASE Section, with respect to **loss** under this Coverage Module, before coverage will apply, **you** must:

(1) complete and sign a written, detailed and sworn proof of loss within ninety (90) days after the discovery of a **loss** (unless such period has been extended by **our** written agreement) including a full description of such **loss** and the circumstances surrounding such **loss**, including without limitation, the time, place and cause of the **loss**, a detailed calculation of any **information asset loss, your** interest and the interest of all others in the property, the sound value thereof and the amount of **loss** or damage thereto and all other insurance thereon.  Proof of loss shall also include the underlying documents and materials of whatever media that reasonably relates to or forms a part of the basis of the claim for such **loss;**

(2) upon **our** request, submit to an examination under oath;

(3) immediately record the specifics of any **loss** or **failure of security** and the date **you** first became aware of such **loss** or **failure of security;**

(4) provide **us** with any cooperation and assistance that **we** may request, including assisting **us** in:

(a) any investigation of a **failure of security, loss** or circumstance making settlements;

(b) enforcing any legal rights you or we may have against anyone who may be liable to **you;**

(c) executing any documents that **we** deem are necessary to secure **our** rights under this policy;

(d) any inspection or survey conducted by **us** pursuant to this Coverage Module; and

All adjusted claims shall be due and payable thirty (30) days after the presentation to the address shown above and written acceptance by **us** of satisfactory proof of **loss**.  The costs and expenses of establishing or proving **your loss** for this policy, including without limitation those connected with preparing a proof of loss, shall be **your** obligation, and are not covered under this policy.

13. **COVERAGE MODULE EXTENDED REPORTING PERIOD**

If **we** or the **named insured** shall cancel this policy or refuse to replace the BASE policy, **you** shall have up to one (1) year following the effective date of such cancellation or refusal to discover and report to **us** any covered **loss** under this Coverage Module (hereinafter referred to as **"extended reporting period"** for purposes of this Coverage Module).   Clause 9. **EXTENDED REPORTING PERIOD**, and the definition of **extended reporting period**, as defined in Clause 2. **DEFINITIONS**, paragraph (l) of the BASE Section, shall not apply to this Coverage Module).

14. **EXPERT ASSESSMENT RIGHTS**

Under this Coverage Module only, **you** and **we** each have the right to demand that the amount of **loss** be determined by an expert.  If either **you** or **we** make a written demand for an expert opinion, each will select a competent independent expert and notify the other of the expert's identity within twenty (20) days of the receipt of the written demand by the other party.  The two experts will then select a competent, impartial umpire.  The experts will then determine and state separately the amount of each **loss**.  If the experts submit a written report and they agree to use the same amount, the amount agreed upon will be the amount of the **loss**.  If the experts fail to agree within a reasonable time, they will submit only their differences to the umpire.  Written agreement so itemized and signed by any two of these three will determine the amount of the **loss**.  Each expert will be paid by the party selecting the expert.  Other expenses of the expert and the compensation of the umpire will be paid equally by **you** and **us**.  If such experts are used, **we** will still retain our right to deny coverage.

© 2006 American International Group, Inc. All rights reserved.

4

EXHIBIT C
PAGE 523

\<End of Module\>

 © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 524



# AIG netAdvantage®

## BUSINESS INTERRUPTION MODULE
### FIRST PARTY COMPUTER NETWORK BUSINESS INTERRUPTION INSURANCE

**1. MODULAR FORMAT**

This BUSINESS INTERRUPTION Module is a part of an AIG netAdvantage policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules.   This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above.   The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.

**2. BASE INSURING CLAUSES**

Clause 2. Insuring Agreements, (i) the paragraph preceeding Coverage A, (ii) Coverage A and (iii) Coverage B, of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

**3. BUSINESS INTERRUPTION MODULE INSURING CLAUSE**

**We** shall pay an **organization** the actual **business interruption loss**, in excess of the applicable Retention, which such **organization** sustains during the **period of recovery** (or the **extended interruption period** if applicable), resulting directly from a **material interruption**.   The **failure of security** causing the **material interruption** and the **business interruption loss** must each first occur during the **policy period**.

**4. BASE DEFINITIONS**

With respect to the coverage afforded under this Coverage Module only, the definitions of the BASE Section are hereby deleted and replaced, or amended (as applicable) as follows:

**"Loss"** is amended by replacing the first sentence entirely and the lead-in language of the second sentence as follows:

> **"Loss"** means the total sum of any **business interruption loss**.   However, **"loss"** and **"business interruption loss,"** shall not mean, and this policy shall not cover:

**5. MODULE DEFINITIONS**

BI (a)   **"Business"** means an **organization's** operations that are dependent upon or make use of **your computer system.**

BI (b)   **"Business interruption loss"** means the sum of:  (1) **income loss**;  (2) **extra expense**; (3) **dependent business interruption loss**;  and (4) **extended business interruption loss**, but only in the event the amount of **extra expense** and **income loss** during the **period of recovery** together exceed the applicable Retention.

> Provided, however, **business interruption loss** shall not mean, and there shall be no coverage under this Module for: (1) loss arising out of any liability to third-parties for whatever reason; (2)  legal costs or legal expenses of any type; (3) costs or expenses you incur to update, upgrade, enhance, or replace your computer system to a level beyond that which existed prior to sustaining loss; (4)  loss incurred as a result of unfavorable business conditions; or (5) costs or expenses you incur to identify and remove software program errors or vulnerabilities.

EXHIBIT C
PAGE 525

**Business interruption loss** shall be calculated based on the actual **business interruption loss** an **organization** sustains per hour.  This definition is subject to the limitations set forth in the Definition of loss, as such term is defined in Clause 2. DEFINITIONS, paragraph (s) of the BASE Section and amended in this Coverage Module.

BI (c)   **"Dependent business"** means an entity that **you** do not own, operate or control, but that **you** depend on to conduct **your organization's** business.

BI (d)   **"Dependent business interruption loss"** means an **organization's income loss** incurred as a direct result of a **material interruption** caused directly by a **failure of security** of a **dependent business**, but only if such **failure of security** would have been covered under this Coverage Module if such **dependent business** had been the **named insured**, applying the same terms and conditions herein.

BI (e)   **"Extended business interruption loss"** means an **organization's income loss** during the **extended interruption period**.

BI (f)   **"Extended interruption period"** means the period of time that:

(1) begins on the date and time that the **period of recovery** ends; and

(2) ends on the date and time an **organization** restores, or would have restored if **you** had exercised due diligence and dispatch, the net profit (or loss) before income taxes that would have been earned by an **organization** directly through an **organization's business** had there not been a **material interruption.**

Provided, however, any **extended interruption period** shall end no later than thirty (30) consecutive days after the date and time the **period of recovery** ends.

BI (g)   **"Extra expense"** means the expenses an **organization** incurs that are both reasonable and necessary during the **period of recovery**:

(1) to reduce its **income loss**, provided that such expenses: (a)  are over and above  the  total reasonable and necessary expenses that such **organization** would have incurred had no **material interruption** occurred; and (b) do not exceed the amount by which the **income loss** covered under this policy is thereby reduced;

(2) to minimize or avoid the **material interruption** and continue such **organization's business**, which would not have been incurred had no **material interruption** occurred;  provided, however, that such expenses shall not include **forensic expenses**; or

(3) as **forensic expenses**, which would not have been incurred had no **material interruption** occurred.

Provided, however, that with respect to any **material interruption** caused by a **failure of security** of an **organization's dependent business**, **extra expense** shall be limited to those expenses described in above subparagraph (1) of this paragraph.

BI (h)   **"Failure(s) of security"** means:

(1) the actual failure and inability of the **security** of **your computer system** to mitigate loss from or prevent a **computer attack**; or

(2) with respect to **dependent business interruption** only, the actual failure and inability of the **security** of an **organization's dependent business' computer system** to prevent a **computer attack**.

**"Failure of security"** shall also include such actual failure and inability above, resulting from the theft of a password or access code by non-electronic means in direct violation of an **organization's** specific written **security** policies or procedures.

BI (i)   **"Forensic expenses"** means those additional expenses an **organization** incurs to conduct an investigation of **your computer system** to determine the source or cause of the **failure of security** that caused the **material interruption.**

BI (j)   **"Income loss"** means the:

EXHIBIT C

2   © 2006 American International Group, Inc.  All rights reserved.   PAGE 526

(1) net profit (or loss) before income taxes that is prevented from being earned by an **organization** through an **organization's business** directly because of a **material interruption**; and

(2) normal operating expenses incurred by an **organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **period of recovery** (or **extended interruption period**, if applicable), and only to the extent that such expenses would have been incurred by such **organization** had no **material interruption** occurred.

**Income loss** shall be calculated on an hourly basis based on **your** actual net profit (or loss) and actual and normal operating expenses, as described above.  For purposes of this policy, "net profit (or loss)" shall be calculated in accordance with Clause 14 of this Coverage Module.

However, **income loss** shall be reduced to the extent an **organization** is able to, or should have been able to with the exercise of due diligence and dispatch, in whole or in part, end, reduce or limit the **material interruption** of **your computer system**, or conduct an **organization's business** by other means.

BI (k)   **"Material interruption"** means the actual and measurable interruption or suspension of **your computer system**, which is directly caused by a **failure of security**.

BI (l)   **"Period of recovery"** means the time period that:

(1) begins on the date and time that a **material interruption** first occurs; and

(2) ends on the date and time that the **material interruption** ends, or would have ended if **you** had exercised due diligence and dispatch.

Provided, however, the **period of recovery** shall end no later than thirty (30) consecutive days after the date and time that the **material interruption** first occurred.

BI (m)   **"Waiting hours period"** means the number of hours set forth in Item 4 of the Declarations with respect to this Coverage Module, and shall apply to each **period of recovery**.

BI (n)   **"Waiting hours retention"** means the dollar amount of **business interruption loss** an **organization** incurs during a **waiting hours period**.

## 6. BASE EXCLUSIONS

The Exclusions set forth in Clause 4 of the BASE Section are not applicable to this Coverage Module, except for the following paragraphs: 4(a) (dishonest acts);  4(d) (pollution exclusion); 4(f) (**trade secret**); 4(j) (**bodily injury/property damage** exclusion); 4(l) (first inception); 4(q)(satellite exclusion); 4(s) (physical damage exclusion); and, 4(t) (known shortcomings exclusion)

## 7. MODULE EXCLUSIONS

This Coverage Module shall not cover any **failure of security** or **business interruption loss**:

BI (a)   arising out of or resulting, directly or indirectly, from any circumstance or occurrence that has been reported to an insurer on, or is covered under, any other policy of insurance effective prior to the inception date of this policy; or alleging or arising out of the same **failure of security** or series of continuous, repeated or related **failures of security** or alleging the same or similar facts, alleged or contained in any claim that has been reported, or any **failure of security** of which notice has been given, under any policy of which this policy is a replacement or succeeds in time;

BI (b)   arising out of or resulting, directly or indirectly, from any seizure, confiscation, nationalization, or destruction of **your computer system** or information assets by order of any governmental or public authority;  or

BI (c)   arising out of or resulting, directly or indirectly, from any wear and tear or gradual deterioration of **your computer system**.

## 8. LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING CLAIMS EXPENSES), Solely with respect to the coverage afforded under this Coverage Module, in Clause 5. **LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING CLAIMS EXPENSES)** of the BASE Section paragraph (a), subsections (2) and (5) are deleted in their entirety and replaced with the following:

EXHIBIT C
PAGE 627

(2)  Each **sublimit of liability** set forth in the Declarations as applicable to a specific Coverage Module is the most **we** shall pay under this policy as **loss** in respect of such Coverage Module regardless of the number of persons, occurrences, **claims**, **failures of security** or entities covered by this policy, claimants or **claims** brought against any **insured**, subject to the following:

If two or more Coverage Modules apply to **loss** and the amount of the **sublimits of liability** differ, the most **we** will pay for **loss** covered by any single Coverage Module is the **sublimit of liability** applicable to that Coverage Module. In any event the highest applicable **sublimit of liability** shall be **our** maximum limit of liability for all **loss** from such **failure of security**.

With respect to this Coverage Module, **our** total liability for all **loss** arising from any and all **failures of security** first occurring and reported to **us** during the **policy period** or any applicable **extended reporting period**, alleging any **failure of security** or series of continuous, repeated or related **failures of security** shall not exceed the applicable **sublimit of liability**, subject to the following:

(a)  our total liability for covered **business interruption loss** per hour during the **period of recovery** (or **extended interruption period** if applicable) from any and all covered **failures of security** is ten percent (10%) of the applicable **sublimit of liability**;

(b)  our total liability for covered **forensic expenses** arising from each covered **failure of security** shall be one hundred thousand dollars ($100,000); and

(c)  our total liability for the sum of covered **dependent business interruption loss** and any **extra expense** related thereto, arising from any and all covered **failures of security**, in the aggregate for this Coverage Module, shall be one hundred thousand dollars ($100,000).

**Loss** or a **failure of security** arising out of the same **failures of security**, or a series of continuous, repeated or related **failures of security** shall be deemed to arise from the first such **failure of security**.

(5)  **Business interruption loss** is part of and subject to the **policy limit of liability** and the applicable **sublimit of liability** in this policy.

9.  **RETENTION**:   Solely with respect to the coverage afforded under this Coverage Module, in Clause 6. **RETENTION** of the BASE Section, paragraph (a) is deleted in entirety and replaced with the following:

(a)  *Retention*:  For each **failure of security**, the **insurer** shall only be liable for the amount of **loss** arising from such **failure of security** that exceeds the Retention amount applicable to this Coverage Module affording coverage for such **failure of security**. Such Retention amounts must be borne by the **insureds** and remain uninsured with regard to all **loss**.  In the event a **failure of security** triggers more than one Retention amount, then, as to that **failure of security**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **loss** arising from such **failure of security**.  A single Retention amount shall apply to **loss** arising from all **failures of security** alleging the same **failures of security**, or series of continuous, repeated or related **failures of security**. In **our** sole and absolute discretion, **we** may advance all or part of the applicable Retention amount in which case **you** agree to repay **us** immediately after **we** notify **you** of that payment.

10. **RETENTION**: Solely with respect to the coverage afforded under this Coverage Module, Clause 6. **RETENTION** of the BASE Section is hereby amended by appending the following to the end of that paragraph:

(b)  With respect to this Coverage Module, the applicable Retention is the greater of: (1) the dollar retention amount set forth in Item 4 of the Declarations or (2) the **waiting hours retention**. An **organization** is responsible for the Retention whether based on the dollar retention or **waiting hours retention** amount, and such **organization** may not insure it. The dollar retention amount applies to each **failure of security** or series of continuous, repeated or related **failures of security**.  The **waiting period retention** applies to each **period of recovery**. In the event a **failure of security** or series of continuous, repeated or related **failures of security** results in more than one **period of recovery**, a **waiting hour retention** shall apply to each **period of recovery**.

Provided, however, in the event a **failure of security** or series of continuous, repeated or related **failures of security** results in coverage under this Coverage Module and any Information Asset Coverage Module (if applicable), for purposes of determining the applicable Retention for this Coverage Module, the dollar

retention amount set forth in Item 4 of the Declarations shall be reduced by the actual amount **you** pay as a Retention under such Information Asset Coverage Module (if applicable).

11. **NOTICE AND AUTHORITY**, Solely with respect to the coverage afforded under this Coverage Module, Clause 7. **NOTICE AND AUTHORITY**, paragraph (a) of the BASE Section, is deleted in its entirety and replaced with the following:

(a) *Business Interruption Module*. **You** must notify **us** in writing of **your business interruption loss** as soon as practicable, but in all events either within the **policy period** or **extended reporting period** (if applicable).

12. **WHAT YOU MUST DO IN THE EVENT OF A LOSS UNDER THIS COVERAGE MODULE**

In addition to the applicable items in Clause 7. **NOTICE AND AUTHORITY** and Clause 8. **WHAT YOU MUST DO IN THE EVENT OF A CLAIM** of the BASE Section, with respect to **loss** under this Coverage Module, before coverage will apply, **you** must:

(1) complete and sign a written, detailed and sworn proof of loss within ninety (90) days after the discovery of a **loss** (unless such period has been extended by **our** written agreement) including a full description of such **loss** and the circumstances surrounding such **loss**, including without limitation, the time, place and cause of the **loss**, a detailed calculation of any **business interruption loss**, **your** interest and the interest of all others in the property, the sound value thereof and the amount of **loss** or damage thereto and all other insurance thereon. Proof of loss shall also include the underlying documents and materials of whatever media that reasonably relates to or forms a part of the basis of the claim for such **loss**;

(2) upon **our** request, submit to an examination under oath;

(3) immediately record the specifics of any **loss** or **failure of security** and the date **you** first became aware of such **loss** or **failure of security**;

(4) at **our** request report such **loss** or **failure of security** to the FBI, CERT, ISAC or any other central reporting or investigative organization that **we** may designate;

(5) **you** must provide **us** with any cooperation and assistance that **we** may request, including assisting **us** in:

(a) any investigation of a **failure of security**, **loss** or circumstance making settlements;

(b) enforcing any legal rights you or we may have against anyone who may be liable to **you**;

(c) executing any documents that we deem are necessary to secure our rights under this policy;

(d) any inspection or survey conducted by us pursuant to this Coverage Module; and

All adjusted claims shall be due and payable thirty (30) days after the presentation to the address shown above and written acceptance by **us** of satisfactory proof of **loss**. The costs and expenses of establishing or proving **your loss** for this policy, including without limitation those connected with preparing a proof of loss, shall be **your** obligation, and are not covered under this policy.

13. **COVERAGE MODULE EXTENDED REPORTING PERIOD**

If **we** or the **named insured** shall cancel this policy or refuse to replace the BASE policy, **you** shall have up to one (1) year following the effective date of such cancellation or refusal to discover and report to **us** any covered **loss** under this Coverage Module (hereinafter referred to as "**extended reporting period**" for purposes of this Coverage Module). Clause 9. **EXTENDED REPORTING PERIOD**, and the definition of "**extended reporting period**," as defined in Clause 2. **DEFINITIONS**, paragraph (l) of the BASE Section, shall not apply to this Coverage Module.

14. **NET PROFIT CALCULATIONS**

In determining the amount of net profit (or loss) and charges and expenses covered hereunder for the purpose of ascertaining the amount of **income loss** (and otherwise) sustained under this Coverage Module, due consideration shall be given to the prior experience of an **organization's business** before the beginning of the **period of recovery** and to the probable **business** such **organization** could have performed had no **material interruption** occurred. Provided, however, that such net profit (or loss) calculations shall not include EXHIBIT C

policy shall not cover, net income that would likely have been earned as a result of an increase in volume of **business** due to favorable business conditions caused by the impact of **computer attacks** on other businesses.  All such net profit (or loss) and charges and expenses shall be calculated on an hourly basis and based on such **organization's** actual net profit (or loss) and charges and expenses.

15. **EXPERT ASSESSMENT RIGHTS**

Under this Coverage Module only, **you** and **we** each have the right to demand that the amount of **loss** be determined by an expert.  If either **you** or **we** make a written demand for an expert opinion, each will select a competent independent expert and notify the other of the expert's identity within twenty (20) days of the receipt of the written demand by the other party.  The two experts will then select a competent, impartial umpire.  The experts will then determine and state separately the amount of each **loss**. If the experts submit a written report and they agree to use the same amount, the amount agreed upon will be the amount of the **loss.**  If the experts fail to agree within a reasonable time, they will submit only their differences to the umpire.  Written agreement so itemized and signed by any two of these three will determine the amount of the **loss.** Each expert will be paid by the party selecting the expert.  Other expenses of the expert and the compensation of the umpire will be paid equally by **you** and **us.**  If such experts are used, **we** will still retain our right to deny coverage.

<p align="center">&lt;End of Module&gt;</p>

6

© 2006 American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 530

 **AIG netAdvantage®**

# CYBER EXTORTION MODULE
## CYBER-EXTORTION INSURANCE

1. **MODULAR FORMAT**

   This CYBER EXTORTION Module is a part of an AIG netAdvantage policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules. This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above. The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module. THIS COVERAGE MODULE IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS.

2. **BASE INSURING CLAUSES**

   Clause 2. Insuring Agreements, (i) the paragraph preceeding Coverage A, (ii) Coverage A, and (iii) Coverage B of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

3. **CYBER-EXTORTION MODULE INSURING CLAUSE**

   **We** shall indemnify **you** for those amounts, in excess of the applicable Retention, **you** pay as **extortion monies** resulting from an **extortion claim** first made against **you** and reported to **us** in writing during the **policy period**.

4. **BASE DEFINITIONS**

   Solely with respect to the coverage afforded under this Coverage Module only, the following definitions of the BASE Section are hereby deleted in their entirety and replaced with the following:

   "Claim" means **extortion claim**.

   "Damages" means **extortion monies**.

5. **MODULE DEFINITIONS**

   CE(a)  **Covered loss** means otherwise covered **loss** under any applicable Security Liability Module, Information Asset Module or Business Interruption Module, which has been made part of this policy.

   CE(b)  **Extortion claim** means any threat or connected series of threats to commit an intentional **computer attack** against **you** that would result in **covered loss**, for the purpose of demanding money, securities or other tangible or intangible property of value from **you**.

   CE(c)  **Extortion monies** means any monies paid by **you** with **our** prior written consent to a person(s) whom **we** reasonably believe to be responsible for an **extortion claim**, solely where such payment is made to terminate or end such **extortion claim**; provided, however, that such monies shall not exceed the amount **we** reasonably believe to be the **covered loss** had the **extortion monies** not been paid.

   <End of Module>

EXHIBIT C
PAGE 531

**AIG**

# AIG netAdvantage®

## CRIMINAL REWARD MODULE

### 1. MODULAR FORMAT

This Criminal Reward Module is a part of an AIG netAdvantage Modular Edition policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules.  This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above.  The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.

### 2. BASE INSURING CLAUSES

Clause 2. Insuring Agreements, (i) the paragraph preceeding Coverage A, (ii) Coverage A, and (iii) Coverage B of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

### 3. CRIMINAL REWARD MODULE INSURING CLAUSE

**We** may pay on **your** behalf, at **our** sole and absolute discretion, up to fifty thousand dollars ($50,000), in the aggregate, as a **criminal reward fund**.   No **Retention** shall apply to this coverage.

### 4. MODULE DEFINITIONS

CR(a)  **"Criminal reward fund"** means any amount offered and paid by **us** for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this policy.  Provided, however, **we** shall not pay any **criminal reward fund** for, and this policy shall not cover any amount based upon, any information provided by **you, your** auditors, whether internal or external, any individual hired or retained to investigate the aforementioned illegal acts, or any other  individuals  with  responsibilities  for  the  supervision  or  management  of  the  aforementioned individuals.  This definition is subject to the limitations set forth in the Definition of **loss**.

### 5. EXCLUSIONS

All BASE Section exclusions and all MODULE exclusions which are applicable to the Network Security Module, Network Security & Privacy Module, the Business Interruption Module, or the Information Asset Module (as applicable) shall apply to this coverage Module.

### 6. LIMIT OF LIABILITY (FOR ALL LOSS-INCLUDING CLAIM EXPENSES)

With respect to the coverage afforded under this Coverage Module, Clause 5. **LIMIT OF LIABILITY** of the BASE Section is amended as follows:

Subparagraph 5(a)(1) is deleted in its entirety and replaced with the following:

(1) The aggregate **policy limit of liability** set forth in the Declarations is the most **we** will pay as **loss** (other than **Criminal Reward Fund**) under this policy, in the aggregate, for all coverages combined, regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured**.

Clause 5. is amended to include the following paragraph at the end of that paragraph:

CR(a)  **Our** total liability for any payment as a part of the **criminal reward fund** arising from any and all events occurring during the **policy period**, in the aggregate, shall be $50,000. This limit shall be **our** maximum liability under this policy regardless of the number of events, incidents, **loss** or **claims** reported during the **policy period**.  The **criminal reward fund** shall be in addition to the **policy limit of liability**.

   © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 532

## 7.  CRIMINAL REWARD COVERAGE PROVISIONS

(a) There shall be no Retention applicable to this Coverage Module and **we** shall pay any **criminal reward funds** subject to all other terms and conditions of this Coverage Module.

<End of Module>

91101 (06/06)                                        2                    © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 533



# AIG netAdvantage®

## CRISIS MANAGEMENT MODULE
### (with Identity Theft Services)

**1. MODULAR FORMAT**

This CRISIS MANAGEMENT Module is a part of an AIG netAdvantage Modular Edition policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules.  This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above.  The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.

**2. BASE INSURING CLAUSES**

Clause 2. Insuring Agreements, (i) the paragraph preceeding Coverage A, (ii) Coverage A, and (iii) Coverage B of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

**3. CRISIS MANAGEMENT MODULE INSURING CLAUSE**

**We** shall pay on behalf of an **organization** those **crisis management expenses** and **identity event service expenses** in excess of the applicable Retention incurred in connection with a **crisis management event** first occurring during the **policy period**, but solely up to the amount of the **crisis management fund. Our** obligation to pay **crisis management expenses** and **identity event service expenses** ends upon the exhaustion of the **crisis management fund.**

**4. MODULE DEFINITIONS**

CM(a)  **"Crisis management event"** means one of the following events:

(1) **Failure of security:**  An otherwise covered **"failure of security"** as defined in the Security Liability Module, the Security & Privacy Liability Module, the Business Interruption Module, or the Information Asset Module, but only if any such module has been made part of this policy; or,

(2) **Privacy Peril:**  An otherwise covered **"privacy peril"** as defined in the Security Liability Module or the Security & Privacy Module, but only if any such module has been made part of this policy.

(3) **Personal identity event.**

Provided, however, **crisis management event** shall not mean any event involving:

(i) any **claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time, whether or not such policy affords coverage for such **crisis management event;** or

(ii) the actual, alleged or threatened discharge, dispersal, release or escape of **pollutants**; or any direction or request to test for, monitor, clean up, remove, contain, treat detoxify or neutralize **pollutants.**

CM(b)  **"Crisis management expenses"** means the following amounts incurred within six (6) months of a **crisis management event,** regardless of whether a **claim** is ever made against an **insured** arising from such **crisis management event** and, in the case where a **claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **claim:**

(1) amounts incurred within 180 days of an **insured's** discovery of a **crisis management event** for which an **organization** is legally liable for the reasonable and necessary fees and expenses incurred by a **crisis management firm** in the performance of **crisis management services** for an **organization** arising from a **crisis management event;**

(2) amounts incurred, within 180 days of an **insured's** discovery of a **crisis management event** for

© 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 534

which an **organization** is legally liable, for the reasonable and necessary printing, advertising, mailing of materials, expenses for travel by directors, officers, partners, **employees** or agents of the **organization** or the **crisis management firm**, in connection with the **crisis management event**; and

(3) amounts incurred by an **organization,** within 180 days of an **insured's** discovery of a **crisis management event,** for the reasonable and necessary printing, advertising, mailing of materials or other costs to provide notice to consumers of a **failure of security** or **personal identity event** for the purposes of maintaining goodwill or in compliance with any consumer notification requirements imposed by law, including but not limited to, the statute known as California SB 1386 (§1798.82, *et. al.* of the California Civil Code).

provided, however, **crisis management expenses** shall not include compensation, fees, benefits, overhead, charges or expenses of any **insured** or any **employee.**

This definition is subject to the limitations set forth in the Definition of **loss.**

CM(c) **"Crisis management firm"** means any public relations firm, crisis management firm or law firm hired or appointed by **us**, or by **you** with **our** prior written consent, to perform **crisis management services** in connection with a **crisis management event**.

CM(d) **"Crisis management fund"** means the amount set forth as the applicable **sublimit of liability** for this Coverage Module in Item 4 of the Declarations.

CM(e) **"Crisis management services"** means those services performed by a **crisis management firm** in advising an **organization** or any of its directors, officers, partners or **employees**, on minimizing potential harm to the **organization** arising from the **crisis management event**, including, without limitation, maintaining and restoring public confidence in the **organization**.

CM(f) **"Identity event service expenses"** means reasonable fees and expenses incurred by an **organization**, within one (1) year following **your** discovery of an otherwise covered **personal identity event** that first occurred during the **policy period**, for identity theft education and assistance, credit file monitoring services, or any other service specifically approved by **us** in writing. Such services shall be provided to any individual whose **personal identification** is the subject of a **personal identity event** and shall be for the primary purpose of mitigating the effects of such **personal identity event.**

CM(g) **"Personal identification"** means any information from which an individual may be uniquely and reliably identified, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords.

CM (h) **"Personal identity event"** means any event involving an **organization** that has or could reasonably result in the disclosure and fraudulent use of **personal identification,** that is or was in the care, custody or control of an **insured**.

## 5. EXCLUSIONS

All BASE Section exclusions and all MODULE exclusions which are applicable to the Security Liability Module, the Security & Privacy Liability Module, the Business Interruption Module, or the Information Asset Module (as applicable) shall apply to this coverage Module.

## 6. LIMIT OF LIABILITY

With respect to the coverage afforded under this Coverage Module, Clause 5. **LIMIT OF LIABILITY** of the BASE Section is amended as follows:

Subparagraph 5(a)(1) is deleted in its entirety and replaced with the following:

(1) The aggregate **policy limit of liability** set forth in the Declarations is the most **we** will pay as **loss** (including **crisis management expenses** and **identity event service expenses**) under this policy, in the aggregate, for all coverages combined, regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured**.

Clause 5. is amended to include the following paragraph at the end of that paragraph:

CM(a) **Our** total liability for all **crisis management expenses** and **identity event service expenses** arising from any and all **crisis management events** occurring during the **policy period**, in the aggregate, shall be the

EXHIBIT C
PAGE 535

crisis management fund, less the coinsurance percentage listed in the policy DECLARATIONS. This limit shall be **our** maximum liability under this policy regardless of the number of **crisis management events** reported during the **policy period**. The **crisis management fund** shall be in addition to the **policy limit of liability**.

## 7. CRISIS MANAGEMENT COVERAGE PROVISIONS

(a) A **crisis management event** shall be reported to **us** as soon as practicable, but in no event later than thirty (30) days after the **named insured** first incurs **crisis management expenses** for which coverage will be requested under this policy.

(b) There shall be no requirement for the **named insured** to obtain **our** prior written approval before incurring any **crisis management expenses,** provided that the **crisis management firm** selected by the **named insured** to perform the **crisis management services** has been approved by **us**.

(c) Solely with respect to **identity event services expenses**, before coverage will apply under this **policy**, the **insured** shall notify **us** in writing as soon as practicable but no later than sixty (60) days after first discovery of the **personal identity event** by an **insured**. Notice must include:

    1. How, when, and where the **personal identity event** took place;

    2. The number of individuals and type of **personal identification** involved in the **personal identity event**; and

    3. Upon request by us, the names and addresses of individuals affected by the **personal identity event**.

<End of Module>

90823 (05/06)          3          © 2006 American International Group, Inc. All rights reserved.

EXHIBIT C
PAGE 536

ENDORSEMENT# 1

This endorsement, effective *12:01 am*    *March 8, 2007*         forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

### COMPUTER CRIME ENDORSEMENT

#### AIG netAdvantage

**This endorsement amends the INFORMATION ASSET Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that the INFORMATION ASSET module of the policy is amended as follows:

(1)    Unless otherwise set forth, the terms and conditions contained in this Endorsement shall apply only to coverage extended by virtue of this Endorsement. Unless otherwise stated the terms, conditions, and exclusions of the policy to which this Endorsement is endorsed also apply to the coverage extended by virtue of this Endorsement. The coverage provided under this Endorsement is provided on a **difference in conditions** basis.

(2)    Solely with respect to the coverage afforded under this endorsement, CLAUSE 3, INFORMATION ASSET MODULE INSURING CLAUSE is hereby deleted in its entirety and replaced with the following:

**INFORMATION ASSET MODULE INSURING CLAUSE**

IA (1)    **We** shall pay an **organization** the actual **information asset loss** that such **organization** sustains, in excess of the applicable Retention, resulting directly from **injury** to **information assets** first occurring during the **policy period**. Such **information asset loss** must first occur during the **policy period** and result from a **failure of security** of **your computer system** that also first occurs during the **policy period**.

IA (2)    **We** will pay an **organization** the actual **computer crime loss** that such **organization** sustains, in excess of the applicable Retention, resulting directly from a **computer theft** first occurring during the policy period. Such **computer crime loss** must first occur during the **policy period** and result from a **failure of security** of **your computer system** that also first occurs during the **policy period.**

(3)    Solely with respect to the coverage afforded under this endorsement, CLAUSE 5., MODULE DEFINITIONS, is hereby amended by adding the following definitions to the end of that Clause:

**CR-A.    Computer crime loss** means the amount of **money** or **securities** lost as the result of **computer theft**, as valued pursuant to the paragraph 7 (Valuation of Money and Securities) of this Endorsement. This definition is subject to the limitations set forth in the Definition of **loss.**

EXHIBIT C
PAGE 537

*END 1*

This endorsement, effective *12:01 am*   *March 8, 2007*   forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by   *American International Specialty Lines Insurance Company*

**CR-B.**  **Computer theft** means the intentional and unlawful misappropriation of **money** or **securities** from **you** resulting directly from the use of **your computer system** by an unauthorized person.

**CR-C.**  **Difference in conditions** means subject to all other terms and conditions set forth herein, coverage applies when the covered **computer crime loss**, perils definitions, and conditions set forth herein are broader in meaning or scope than those of an **Insured's** valid and collectible other insurance; and only in that event, does this insurance become primary insurance. In all other circumstances, this insurance shall be excess over an **Insured's** valid and collectible other insurance.

**CR-D.**  **Losses Discovered** or **discovered** means the actual time at which **your** General Counsel, Risk Management Department, management of the IT/IS Department, Internal Audit Department, officer or director became aware that **computer theft** has occurred.

**CR-E.**  **Money** means the following which are owned by **you** or in **your** possession: (1) currency, coins and bank notes in current use and having a face value; (2) travelers checks, registered checks and money orders held for sale to the public; (3) and electronic cash equivalents of (1) and (2).

**CR-F.**  **Securities** means the following which are owned by **you** or in **your** possession: shares, stock, debentures, debenture loan stock, bonds, and any other security of any description and interests in a security, whether the foregoing is certificated or uncertificated. **Securities** do not include **money**.

(4)  Solely with respect to the coverage afforded under this endorsement, in CLAUSE 5., MODULE DEFINITIONS, PARAGRAPH IA (a), " **failure(s) of security**" is deleted in its entirety and replaced by:

IA (a)  " **Failure(s) of security**" means:

(1)  As respects **information asset loss**, the actual failure and inability of the **security** of **your computer system** to mitigate loss from or prevent a **computer attack**. " **Failure of security**" shall also include such actual failure and inability above, resulting from the theft of a password or

EXHIBIT C
PAGE 538

*END 1*

**ENDORSEMENT# *1*    (Continued)**

This endorsement, effective *12:01 am*    *March 8, 2007*    forms a part of
policy number    *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

> access code by non-electronic means in direct violation of an
> **organization's** specific written **security** policies or procedures.
>
> (2)    As respects **computer crime loss**, the actual failure and inability of the
> **security** of **your computer system** to mitigate loss from or prevent a
> **computer theft**.

(5)    Solely with respect to the coverage afforded under this endorsement, CLAUSE 4.,
BASE DEFINITIONS, is deleted in its entirety and replaced with the following:.,

### CLAUSE 4. BASE DEFINTIONS

Solely with respect to the coverage afforded under this Coverage Module, the
definitions of the BASE Section are hereby deleted and replaced, or amended (as
applicable) as follows:

" **Loss**" is amended by replacing the first sentence entirely and the lead in language
of the second sentence as follows:

> **Loss** means the total sum of any **damages, claim expenses, extortion
> monies, information asset loss, business interruption loss, criminal reward
> fund, computer crime loss** and **crisis expenses.**    However, " **loss**,"
> " **damages**," " **claim expenses**," " **extortion monies**," " **information asset loss**,"
> " **business interruption loss**," " **criminal reward fund**," " **computer crime loss**"
> and " **crisis expenses**" shall not mean, and this policy shall not cover:

> **"First inception date"** is amended by adding the following to the end of that
> definition:

> For purposes of Coverage IA(2), **first inception date** means the
> inception date of the first computer or electronic crime, computer
> theft or computer crime, policy or endorsement issued by **us** or any
> other member company of American International Group, Inc. ("AIG")
> to the **named insured** and continually replaced by **us** or any other AIG
> member company until the inception date of this policy that provides
> substantially equivalent coverage as is provided by this endorsement

EXHIBIT C
PAGE 539

*END 1*

**ENDORSEMENT# 7   (Continued)**

This endorsement, effective *12:01 am*     *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to     *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

(6)   Solely with respect to the coverage afforded under this endorsement, CLAUSE 7, MODULE EXCLUSIONS, is hereby amended by adding the following to the end of that Clause

with respect to Coverage IA(2) only, **we** will not cover any **computer crime loss** or **loss** arising out of or resulting, directly or indirectly, from:

**CR-A.**   forged, altered or fraudulent negotiable instruments, **securities, money**, documents, or written instruments used as source documentation, or manually keyed into **your computer system**;

**CR-B.**   indirect or consequential **loss**, including without limitation potential income or lost business opportunities;

**CR-C**   any **loss** resulting from the unauthorized access or use of your telephone system;

**CR-D.**   any **loss** resulting directly or indirectly from the use or purported use of credit, debit, charge, access convenience, customer identification or other cards; or

With respect to Coverage IA(2) only, **we** will not cover any **computer crime loss** or **loss**

**CR-E.**   the proof which as to its existence or amount is solely dependent on:

(1)   an inventory computation or comparison; or
(2)   a profit and loss computation or comparison;

(7)   Solely with respect to the coverage afforded under this endorsement, the following CLAUSES are added at the end of the INFORMATION ASSET Module.

**15.   Valuation of Money and Securities**

(1)   Covered c **omputer crime loss** consisting of lost **money** shall be valued at the face value of the lost **money** less the value of any **money** recovered after the **computer theft**. With respect to **money, we** may choose at our sole discretion to pay **computer crime loss** in the currency of the country to which the **computer theft** relates or in the

EXHIBIT C
PAGE 540

*END 1*

*ENDORSEMENT# 1*   (Continued)

This endorsement, effective  *12:01 am*     *March 8, 2007*       forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

> United States dollar equivalent determined by the rate of exchange as published by the *Wall Street Journal* on the  day the  **computer theft** was **discovered**.
>
> (2)    Covered **computer crime loss** consisting of lost **securities** shall be valued at the market value of said **securities** as  published by the *Wall Street Journal* at  the  close  of  business  on the day the  applicable **computer theft** was **discovered**, less the value of any **securities** recovered  as  determined  by  the  value published  in  the *Wall Street Journal* at  the  close  of  business  on  the  day said  **securities**  were recovered; provided, however, in our sole discretion, **we** may pay the:
>
> > (a)    value of such **securities** or replace them in kind, in which event **you** must assign to  us all **your**  rights, title and  interest in and to such securities; or
> >
> > (b)    cost of  any lost  **securities**  bond required  in  connection with issuing duplicates of the **securities**.
>
> In no event shall the  value of **securities** be  determined based on loss or change  of market  value  because of  **your**  inability to  sell  or buy **securities** as the result of the **computer theft**.

### 16.    Limit of Liability

> Regardless of  the number  of  years this  insurance remains  in  force  or  the number of premiums paid, no limit of liability  cumulates from year to year or period to period.  Coverage for **loss** as  is provided under this Endorsement is part of  and not  in addition  to  the  applicable  **sublimit(s) of  liability** for  this Module and the **policy limit of liability** as set forth in the policy.

### 17.    Limited Benefit

> This coverage is  for **your**  benefit only.  It provides  no rights  or benefits to any third party.

### 18.    Recovered Money or Securities

> In the event **you**  recover any **money** or  **securities** that was the  subject of a covered **computer theft**, after we have paid **you**  for **computer crime loss** related to such **money** or **securities**,  **you** shall reimburse **us** the  amount paid

**ENDORSEMENT# 7    (Continued)**

This endorsement, effective  *12:01 am*    *March 8, 2007*    forms a part of
policy number    *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

> by **us** for such recovered **money** or **securities**  within thirty (30) days of such
> recovery.

### 19.    Difference in Conditions

> Notwithstanding Clause 14. of the Base Section (Other Insurance),  coverage
> for **computer theft** is specifically  written on a **difference in  conditions** basis.
> It is a condition of this  policy that all other applicable  insurance policies or
> replacements thereof in  force at the inception of  this policy  will  be
> maintained in full force and effect  during the term  of this policy  or
> notification will be made to us within ninety (90) days of such change. In the
> event of such  notification, **we**  shall have the  right to modify this  policy or
> make adjustments to  the premium  if **we** reasonably  deem that  such policy
> changes or premium  adjustments are  necessary, and such  modifications or
> adjustments shall apply to all  **loss discovered** after the  effective time of the
> failure to maintain.

(8)    Solely with respect to the  coverage afforded under this endorsement,  CLAUSE 13.
COVERAGE MODULE EXTENDED REPORTING PERIOD, is deleted in its entirety  and
replaced with the following:

### 13.    COVERAGE MODULE EXTENDED REPORTING PERIOD

> If **we** or the  **named insured** shall cancel  this policy or  refuse to replace this
> policy, **you** shall have up to one (1) year following the  effective date of such
> cancellation or refusal  to discover and  report to  **us** any covered  **loss** under
> coverages IA(1).
>
> Under coverage IA(2), if **we** or the first **Named Insured** refuses to  renew this
> policy, the first **Named Insured** shall  have the right, upon the  payment  of an
> additional premium of 75%  of the annual premium as set forth in the
> Declarations, to a period  of ninety days (90)  following the effective date  of
> such non-renewal  (herein referred  to as the  "Optional  Extended Reporting
> Period") in which  to give us  written notice to  **us** of any otherwise covered
> **computer theft**  that first occurred  and was  **discovered**  by **you** during the
> **policy period.**    The rights contained in this paragraph  shall  terminate,
> however, unless **we**  receive written  notice of such  election,  together with
> the additional premium due,  within thirty (30)  days of the  effective date of
> non-renewal.  This paragraph  shall  not apply to any  cancellation  resulting
> from non-payment of premium.    The limit of liability  for  the Extended

EXHIBIT C
PAGE 542

*END 1*

**ENDORSEMENT# *1*    (Continued)**

This endorsement, effective  *12:01 am*      *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to     *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

Reporting Period shall  be part of,  and not  in addition to,  the **policy  limit of
liability** and applicable **sublimits of liability** for  Policy Period.  A renewal with
different terms or premium shall not be a refusal to renew this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.

EXHIBIT C

PAGE 543

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 1*

EXHIBIT C
PAGE 544

This endorsement, effective *12:01 am*      *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

### IDENTITY THEFT CALL CENTER SERVICES COVERAGE ENDORSEMENT

### This endorsement modifies the Security & Privacy Liability Module of the policy

In consideration of the premium charged, it is hereby understood and agreed that "Identity Theft Services Coverage" is added to the Security & Privacy Liability Module as described below by amending the policy as follows. The terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and do not modify the terms, conditions, exclusions and other limitations contained in the policy unless specifically set forth herein. Unless otherwise set forth herein, the terms, conditions, exclusions and other limitations contained in the policy apply to the coverage provided by this endorsement:

### 1.(ID). INSURING AGREEMENT

In the event of an otherwise covered **failure of security** or **privacy peril** under the SEC/PRV Module that results in **identity theft**, subject to the aggregate limit set forth in clause 4.(ID) below, **we** shall provide to **identity victims** under this endorsement the **AIG Identity Theft Services Call Center**. The **AIG Identity Theft Services Call Center** shall be provided only for the duration of the **service period**.

### 2.(ID) DEFINITIONS

A.     **Identity victims** means those natural persons who are customers, members or employees of the **named insured** or any **subsidiary** thereof; provided, however, it is represented by the **named insured** that such persons will not exceed 40,000 persons anytime during the **policy period.**

B.     **AIG Identity Theft Services Call Center** means:

(1)     access to a call center through a United States toll-free telephone number where trained identity theft specialists will provide information to **identity victims** about:

(a)     the **computer attack** or **privacy peril** which resulted in the **identity theft** ( **we** will make this information available only if requested by the **named insured**);

(b)     actions that **identity victims** may take to mitigate the possible adverse effects of the **identity theft**; and

EXHIBIT C
PAGE 545

*END 2*

**ENDORSEMENT# 2** (Continued)

This endorsement, effective *12:01 am*      *March 8, 2007*         forms a part of
policy number    *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

> (2)  an "Identity Theft Prevention Kit" containing written information describing actions that **identity victims** may take to mitigate the possible adverse effects of the **identity theft**.
>
> C.   **Service period** means a period ending the earlier of:
>
> (1)  the end of the **policy period,**
>
> (2)  when the cumulative call minutes of all in-bound and outbound calls to or from all **identity victims** combined exceed 40,000.
>
> In the event the **service period** ends prior to the end of the **policy period,** then the **named insured** may request at their own cost that a recording providing information about the **computer attack** or **privacy peril** at issue and basic identity theft prevention information for the remainder of the **policy period.**

**3.(ID)   OBLIGATIONS OF THE INSURED**

As a condition for coverage to under this endorsement the **named insured** shall:

A.   provide to the call center information about the **computer attack** or **privacy peril** at issue, as well as information which can be provided by the call center as to where to direct **identity victims** for more information about the event. Provided, however, that the **named insured** shall only have this obligation if it has opted to have the call center provide this information as indicated above.

B.   be responsible for making **identity victims** aware of the appropriate Insured Identifier which will be used to identify the **insured person** as covered under this endorsement, and call center telephone number as set forth below:

Insured Identifier: 9669520
U.S. toll-free phone number: 1-800-IDHELP2 (or 1-800-434-3572)
(or such successor or replacement number as **we** may advise **you**)

EXHIBIT C
PAGE 546

*END 2*

ENDORSEMENT# *2*     **(Continued)**

This endorsement, effective *12:01 am*     *March 8, 2007*     forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

C.    in the event the **named insured** desires to increase the  represented number
of **identity victims** during  the  **policy period**, transmit  complete, accurate
and timely data to **us**  in order for **us**  to compute additional premium.   The
provision of access to the **AIG Identity Theft Services Call Center** for
additional **identity victims** shall be at **our** sole and absolute discretion.

4.(ID)   **CALL CENTER MINUTES AGGREGATE LIMIT**

The most call center minutes **we** shall provide with respect to  the coverage under
this endorsement, in the aggregate, regardless of the number of **failures of
security, privacy peril** or **identity victims**, shall be  the number of minutes set forth
in Clause 2.(ID). Paragraph C.(2) of this endorsement.

5.(ID)   **OTHER PROVISIONS AFFECTING COVERAGE**

A.    Unless otherwise stated, the  terms, conditions, exclusions and  other
limitations set forth  in this endorsement  are solely applicable  to coverage
afforded under this endorsement.

B.    All other  bolded  terms  used  herein are  used  with  the  same respective
meanings as set  forth in the  policy unless otherwise  stated.    This
endorsement is subject  to all applicable  terms, conditions, exclusions  and
other limitations set forth in the policy.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

EXHIBIT C

AUTHORIZED REPRESENTATIVE PAGE 547

*END 2*    Or Countersignature (In states where applicable)

EXHIBIT C
PAGE 548

**ENDORSEMENT# 3**

This endorsement, effective *12:01 am*      *March 8, 2007*            forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

### BUSINESS INTERRUPTION HOURLY SUB–LIMIT AMENDATORY ENDORSEMENT

**This endorsement amends the BUSINESS INTERRUPTION Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

### SCHEDULE

BUSINESS INTERRUPTION HOURLY SUBLIMIT:          $500,000

(1)    CLAUSE 8 of the BUSINESS INTERRUPTION Module, is hereby deleted and replaced
with the following:

8.    **LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING CLAIMS EXPENSES)**,
Solely with respect to the coverage afforded under  this Coverage Module, in
Clause 5. **LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING CLAIMS
EXPENSES)** of the  BASE Section paragraph (a), subsections (2) and (5) are
deleted in their entirety and replaced with the following:

(2)    Each **sublimit of liability** set forth in the Declarations as applicable to a
specific Coverage Module is  the most **we**  shall pay under  this policy
as **loss** in respect of such Coverage  Module regardless  of the number
of persons, occurrences, **claims, failures of security** or entities
covered by this policy, claimants or  **claims** brought against any
**insured**, subject to the following:

If two or more Coverage Modules apply to **loss** and the amount of the
**sublimits of liability**  differ, the most  **we** will pay  for **loss** covered by
any single  Coverage Module  is the  **sublimit of  liability** applicable to
that Coverage Module.  In any event the highest applicable **sublimit of
liability** shall be  **our** maximum  limit of  liability for  all **loss** from  such
**failure of security**.

With respect  to this  Coverage Module, **our** total  liability for  all **loss**
arising from any and  all **failures of security**  first occurring and
reported to  **us** during the  **policy period** or any  applicable **extended
reporting period**, alleging any  **failure of security** or  series  of
continuous, repeated or related **failures of security** shall not exceed
the applicable **sublimit of liability**, subject to the following:

(a)    our total liability for covered **business interruption loss** per hour
during the **period of recovery** (or **extended interruption period** if

EXHIBIT C
PAGE 549

**ENDORSEMENT#** *3*      **(Continued)**

This endorsement, effective *12:01 am*     *March 8, 2007*      forms a part of
policy number *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

applicable) from any and all covered **failures of security** is the lesser of:

i.      ten percent (10%) of the applicable **sublimit of liability**; or,

ii.     The dollar amount listed in the SCHEDULE of this endorsement.

(b)   our total liability for covered **forensic expenses** arising from each covered **failure of security** shall be five hundred thousand dollars ($500,000); and

(c)   our total liability for the sum of covered **dependent business interruption loss** and any **extra expense** related thereto, arising from any and all covered **failures of security**, in the aggregate for this Coverage Module, shall be five hundred thousand dollars ($500,000).

**Loss** or a **failure of security** arising out of the same **failures of security**, or a series of continuous, repeated or related **failures of security** shall be deemed to arise from the first such **failure of security**.

(5)   **Business interruption loss** shall be part of and not in addition to the **policy limit of liability** and the applicable **sublimit of liability** in this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc. All rights reserved.

EXHIBIT C

AUTHORIZED REPRESENTATIVE     PAGE 550
Or Countersignature (In states where applicable)

*END 3*

ENDORSEMENT # 4

This endorsement, effective *12:01 am*    *March 8, 2007*       forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

## EXTRA EXPENSE AMENDATORY ENDORSEMENT

### This endorsement amends the BUSINESS INTERRUPTION Module of the policy.

In consideration of the premium charged, it is hereby understood and agreed that the BUSINESS INTERRUPTION MODULE is amended as follows:

(1)    CLAUSE 5., DEFINITIONS, PARAGRAPH BI (g) " **extra expense**" is hereby deleted in its entirety and replaced with the following:

BI (g)    **Extra expense** means the expenses an **organization** incurs that are both reasonable and necessary during the **period of recovery**:

  (1)    to reduce its **income loss**, provided that such expenses:

    (a)    are over and above the total reasonable and necessary expenses that such **organization** would have incurred had no **material interruption** occurred; and

    (b)    do not exceed the amount by which the **income loss** covered under this policy is thereby reduced;

  (2)    to minimize or avoid the **material interruption** and continue such **organization's business**, which would not have been incurred had no **material interruption** occurred;    provided, however, that such expenses shall not include **forensic expenses**;

  (3)    as **forensic expenses**, which would not have been incurred had no **material interruption** occurred; or

  (4)    to remove specific identified **malicious code**, provided that:

    (a)    the failure to remove such **malicious code** would cause or increase such **organization's income loss**; and

    (b)    the costs associated with the removal of such **malicious code** do not exceed the    amount of **income loss** that such removal prevented.

EXHIBIT C
PAGE 551

*END 4*

**ENDORSEMENT# *4*** **(Continued)**

This endorsement, effective *12:01 am*    *March 8, 2007*        forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

Provided, however, that with respect to any **material interruption** caused by a **failure of security** of an **organization's dependent business**, **extra expense** shall be limited to those expenses described in above subparagraph (1) of this paragraph.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

EXHIBIT C

AUTHORIZED REPRESENTATIVE PAGE 552
Or Countersignature (In states where applicable)

*END 4*

ENDORSEMENT# 5

This endorsement, effective *12:01 am*     *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to     *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

### "EMPLOYEE" DEFINITION AMENDATORY ENDORSEMENT

**This endorsement amends the BASE Section of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 3. DEFINITIONS, paragraph (k), " **employee**," is amended to include the following at the end thereof:

**Employee** also means any past, present or future officer, director or trustee of the **organization**, but only while acing within the scope of their duties as such, and in furtherance of or on behalf of the legal interests of the **organization**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc. All rights reserved.

EXHIBIT C

PAGE 553

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 5*

EXHIBIT C
PAGE 554

ENDORSEMENT# 6

This endorsement, effective *12:01 am*    *March 8, 2007*        forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

### FRAUD EXCLUSION AMENDATORY ENDORSEMENT

**This endorsement amends the BASE Section of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4. EXCLUSIONS, paragraph (a) is deleted in its entirety and replaced with the following:

(a)    alleging, arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law or of **your privacy policy**, or gaining of any profit or advantage to which **you** or any **additional insured** is not legally entitled, if any of the aforementioned is committed by any of **your** or any **additional insured's**:

(1)    directors, officers, trustees, governors, management committee members, members of the management board or partners (or the equivalent positions), whether acting alone or in collusion with other persons; or

(2)    **employees** (other than those natural persons referenced in sub-paragraph 4.(a)(1) above) or independent contractors employed by **you** or any **additional insured** if any of those natural persons referenced in sub-paragraph 4.(a)(1) above possessed, at any time, knowledge of any dishonest, fraudulent, malicious, or criminal acts committed by such **employee** or independent contractor that caused a direct loss to an **insured** or any other person;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 555

_____
AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 6*

EXHIBIT C
PAGE 556

This endorsement, effective *12:01 am*   *March 8, 2007*        forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by   *American International Specialty Lines Insurance Company*

### FRAUD EXCLUSION AMENDATORY ENDORSEMENT

**This endorsement amends the INFORMATION ASSET Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1.   Clause 6. **BASE EXCLUSIONS** of the INFORMATION ASSET Module is deleted in its
     entirety and replaced with the following:

     **6.   BASE EXCLUSIONS**

          The Exclusions set forth in  Clause 4 of the BASE  Section are not applicable
          to this Coverage Module, except for the following paragraphs: 4(d)  (pollution
          exclusion); 4(j) ( **bodily injury/property damage** exclusion); 4(f) ( **trade secrets**);
          4(l)  (first  inception);  4(q)(satellite  exclusion);  4(s)  (physical  damage
          exclusion); and, 4(t) (known shortcomings exclusion)

2.   Clause 7. **MODULE EXCLUSIONS** of the INFORMATION ASSET Module  is amended
     to include the following at the end thereof:

     IA(d)   alleging, arising  out  of  or  resulting, directly  or indirectly,  from any
             dishonest, fraudulent, criminal  or malicious  act, error  or omission,  or any
             intentional  or  knowing violation  of  the law  or  of **your  privacy policy**,  or
             gaining of any profit or advantage to which **you** or any **additional  insured** is
             not legally entitled, if any  of  the  aforementioned is  committed by any  of
             **your** or any **additional insured's**:

             (1)   directors, officers, trustees,  governors, management committee
                   members, members  of  the  management  board  or  partners (or  the
                   equivalent positions), whether acting alone or in collusion with other
                   persons; or

             (2)   **employees**  (other  than  those  natural  persons  referenced  in
                   sub-paragraph IA(d)(1) above) or independent  contractors employed
                   by **you**  or  any **additional insured**  if any  of those  natural  persons
                   referenced  in sub-paragraph IA(d)(1)  above possessed, at any  time,
                   knowledge of any dishonest,  fraudulent, malicious,  or  criminal acts
                   committed by such **employee** or independent contractor that caused
                   a direct loss to an **insured** or any other person;

EXHIBIT C
PAGE 557

*END 7*

**ENDORSEMENT# 7**   **(Continued)**

This endorsement, effective *12:01 am*     *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

> provided, however, **we** will defend **suits** alleging any of the foregoing
> conduct until there is a judgment against, final adjudication against,
> adverse finding of fact against, adverse admission, at which time **you** shall
> reimburse **us** for **claim expenses**; provided, however, **we** will not defend
> such **suits** if they allege any of the foregoing conduct which has been the
> subject of a criminal proceeding in which an **insured** has been found guilty,
> or pleaded *nolo contender* or no contest;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc.  All rights reserved.

*END 7*

EXHIBIT C

PAGE 558

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

ENDORSEMENT # 8

This endorsement, effective *12:01 am*     *March 8, 2007*          forms a part of
policy number    *966-95-20*
issued to     *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

### FRAUD EXCLUSION AMENDATORY ENDORSEMENT

**This endorsement amends the BUSINESS INTERRUPTION Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.   Clause 6. **BASE EXCLUSIONS**  of the BUSINESS INTERRUPTION Module is deleted in its entirety and replaced with the following:

   #### 6.   BASE EXCLUSIONS

   The Exclusions set forth in Clause 4 of the BASE Section are not applicable to this Coverage Module, except for the following paragraphs: 4(d) (pollution exclusion); 4(f) ( **trade secret**); 4(j) ( **bodily injury/property damage** exclusion); 4(l) (first inception); 4(q)(satellite exclusion); 4(s) (physical damage exclusion); and, 4(t) (known shortcomings exclusion)

2.   Clause 7. **MODULE EXCLUSIONS** of the BUSINESS INTERRUPTION Module is amended to include the following at the end thereof:

   BI(d)   alleging, arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law or of **your privacy policy**, or gaining of any profit or advantage to which **you** or any **additional insured** is not legally entitled, if any of the aforementioned is committed by any of **your** or any **additional insured's**:

      (1)   directors, officers, trustees, governors, management committee members, members of the management board or partners (or the equivalent positions), whether acting alone or in collusion with other persons; or

      (2)   **employees** (other than those natural persons referenced in sub-paragraph BI(d)(1) above) or independent contractors employed by **you** or any **additional insured** if any of those natural persons referenced in sub-paragraph BI(d)(1) above possessed, at any time, knowledge of any dishonest, fraudulent, malicious, or criminal acts committed by such **employee** or independent contractor that caused a direct loss to an **insured** or any other person;

**EXHIBIT C**
**PAGE 559**

*END 8*

**ENDORSEMENT# 8    (Continued)**

This endorsement, effective *12:01 am     March 8, 2007*          forms a part of
policy number  *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

> provided, however, **we** will defend **suits** alleging any of the foregoing conduct until there is a judgment against, final adjudication against, adverse finding of fact against, adverse admission, at which time **you** shall reimburse **us** for **claim expenses**; provided, however, **we** will not defend such **suits** if they allege any of the foregoing conduct which has been the subject of a criminal proceeding in which an **insured** has been found guilty, or pleaded *nolo contender* or no contest;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc.  All rights reserved.

EXHIBIT C

PAGE 560

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 8*

ENDORSEMENT# 9

This endorsement, effective *12:01 am*      *March 8, 2007*                forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by       *American International Specialty Lines Insurance Company*

## CLAIM DEFINITION AMENDATORY ENDORSEMENT

**This endorsement amends the BASE Section of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
3. **DEFINITIONS**, paragraph (e), " **claim**," is deleted in its entirety and replaced with the
following:

(e)     " **Claim**" means:

    (1)     a written demand for money, services, non-monetary relief or injunctive
          relief; or

    (2)     a **suit**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc. All rights reserved.

EXHIBIT C

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 9*

ENDORSEMENT# *10*

This endorsement, effective *12:01 am*     *March 8, 2007*          forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

### NOTICE OF CLAIM PROVISION AMENDATORY ENDORSEMENT

**This endorsement amends the BASE Section of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
7. **notice and authority** of the BASE Section, Subparagraph 7(b)(2)(a) is deleted in its
entirety and replaced with the following:

(a)     before coverage will apply, an **insured** must notify **us** in writing of a **claim** made
against an **insured** as soon as practicable after notice of such **claim** is reported to
any personnel in **your** office of the (i) General Counsel; (ii) Chief Financial Officer; or
(iii) Chief Executive Officer; (iv) Risk Manager; or (v) Chief Security Officer, but in
all events, for coverage under this policy, all **claims** shall be reported no later than
the end of the **policy period** or any applicable **extended reporting period**;


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc.  All rights reserved.


EXHIBIT C
PAGE 562

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 10*

This endorsement, effective *12:01 am*     *March 8, 2007*     forms a part of
policy number     *966-95-20*
issued to     *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

### CONSENT TO SETTLEMENT AMENDATORY ENDORSEMENT

**This endorsement amends the BASE Section of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 2. **INSURING AGREEMENTS** of the BASE Section, paragraph (5) of Coverage B is deleted in its entirety and replaced with the following:

(5)     *When **Our** Duty To Defend Ends*:  **Our** duty to defend ends upon the exhaustion of the **policy limit of liability** or the applicable **sublimit of liability** by payment of **loss**, including **claim expenses**. **Our** duty to defend also ends if **you** fail or refuse to consent to a settlement **we** recommend and the claimant will accept. **You** must then defend the **claim** at **your** own expense. As a consequence of such failure or refusal, **our** liability for **loss** shall not exceed the amount for which **we** could have settled such **claim** had **you** consented, plus **claim expenses** incurred prior to the date of such failure or refusal, plus fifty percent (50%) of the **claim expenses** incurred with **our** consent after the date of such refusal.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc. All rights reserved.

EXHIBIT C

AUTHORIZED REPRESENTATIVE PAGE 563
Or Countersignature (In states where applicable)

*END 11*

**ENDORSEMENT# 12**

This endorsement, effective  *12:01 am*     *March 8, 2007*                forms a part of
policy number   *966-95-20*
issued to    *OFFICE DEPOT, INC.*

by     *American International Specialty Lines Insurance Company*

### SPECIAL CLASS ACTION RETENTION AMENDATORY ENDORSEMENT

**This endorsement amends the Security & Privacy Liability Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that Clause 8. SPECIAL CLASS ACTION RETENTION is deleted in its entirety and replaced with the following:

8.    **SPECIAL CLASS ACTION RETENTION**

For each **class action claim** arising out of a **wrongful act(s)** which resulted in a **privacy peril**, the **insurer** shall only be liable for the amount of **loss** arising from such **class action claim** that exceeds the applicable Retention amount for such **claim**. Accordingly, the Retention amount for each **class action claim** shall be the greater of one million dollars ($1,000,000).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
American International Group, Inc.  All rights reserved.

EXHIBIT C
PAGE 564

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 12*

## ENDORSEMENT# *13*

This endorsement, effective *12:01 am*    *March 8, 2007*    forms a part of
policy number   *966-95-20*
issued to *OFFICE DEPOT, INC.*

by    *American International Specialty Lines Insurance Company*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COVERAGE TERRITORY ENDORSEMENT**

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

_____

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 013*

Page 1 of 1

89644 (7/05)

EXHIBIT C
PAGE 565

ENDORSEMENT# 14

This endorsement, effective *12:01 am*   *March 8, 2007*        forms a part of
policy number   *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by   *American International Specialty Lines Insurance Company*

## FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 90591 | 03/06 | AIG NET ADVANTAGE-AISL DEC |
| 90592 | 03/06 | AIG NET ADVANTAGE-AISL GUTS |
| 90599 | 03/06 | SECURITY/PRIVACY COVERAGE MODULE |
| 90597 | 03/06 | MULTI MEDIA COVERAGE MODULE |
| 90612 | 03/06 | INFORMATION ASSET COVERAGE MODULE |
| 90593 | 03/06 | BUSINESS INTERRUPTION COVERAGE MODULE |
| 90595 | 03/06 | CYBER EXTORTION COVERAGE MODULE |
| 90823 | 05/06 | CRISIS MANAGEMENT W/ID THEFT COVERAGE |
| 91101 | 06/06 | CRIMINAL REWARD FUND COVERAGE MODULE |
| MNSCPT | | COMPUTER CRIME COVERAGE ENDORSEMENT |
| MNSCPT | | IDENTITY THEFT CALL CENTER SERVICES COVERAGE ENDORSEMENT |
| MNSCPT | | BUSINESS INTERRUPTION HOURLY SUB-LIMIT AMENDATORY ENDORSEMENT |
| MNSCPT | | EXTRA EXPENSE AMENDATORY ENDORSEMENT |
| MNSCPT | | "EMPLOYEE" DEFINITION AMENDATORY ENDORSEMENT |
| MNSCPT | | FRAUD EXCLUSION AMENDATORY ENDORSEMENT |
| MNSCPT | | FRAUD EXCLUSION AMENDATORY ENDORSEMENT |
| MNSCPT | | FRAUD EXCLUSION AMENDATORY ENDORSEMENT |
| MNSCPT | | CLAIM DEFINITION AMENDATORY ENDORSEMENT |
| MNSCPT | | NOTICE OF CLAIM PROVISION AMENDATORY ENDORSEMENT |
| MNSCPT | | CONSENT TO SETTLEMENT AMENDATORY ENDORSEMENT |
| MNSCPT | | SPECIAL CLASS ACTION RETENTION AMENDATORY ENDORSEMENT |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| MNSCPT | | FORMS INDEX ENDORSEMENT |
| | | |

EXHIBIT C

AUTHORIZED REPRESENTATIVE   PAGE 566
Or Countersignature (In states where applicable)

*END 14*

**ENDORSEMENT# 15**

This endorsement, effective *12:01 am    October 31, 2007*    forms a part of
policy number  *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by   *American International Specialty Lines Insurance Company*

### PRINTERS E&O MODULE ADDITION ENDORSEMENT

**This endorsement amends the Declarations and PRINTERS E&O Module of this policy.**

In consideration of the additional premium of $10,560, it is hereby understood and agreed
that the policy is amended as follows:

1.   On and as of  10/31/2007, this policy shall  provide coverage for **claims**  arising out
     of any **wrongful act** for which coverage  may be provided  under the  Printers E&O
     Module of the policy, subject to the  terms, conditions, exclusions and other
     limitations set forth in the BASE Section, the Printers  E&O  Module and this
     endorsement.  As of such date, the Printers E&O Module is attached to and made  a
     part of this policy.

2.   Item 4 of the Declarations is amended to include the following at the end thereof:

| 4 | COVERAGE MODULE | SUBLIMIT OF LIABILITY | RETENTION | RETROACTIVE DATE | FIRST INCEPTION DATE |
|---|---|---|---|---|---|
|   | PRINTERS E&O | $1,000,000 | $100,000 | 10/31/2007 | 10/31/2007 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

EXHIBIT C

AUTHORIZED REPRESENTATIVE **PAGE 567**
Or Countersignature (In states where applicable)

*END 15*

**ENDORSEMENT# *16***

This endorsement, effective *12:01 am      October 31, 2007*           forms a part of
policy number   *966-95-20*
issued to *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

### FORMS INDEX (AMENDED)

In consideration of the premium charged, it is hereby understood and agreed that the "Forms Index"
Endorsement is amended to include the following:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | PRINTERS E&O MODULE ADDITION ENDORSEMENT |
| PENMAN | 01/05 | Forms Index (Amended) |
| MNSCPT | | PRINTERS E&O MODULE |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable

EXHIBIT C
PAGE 568

**END 016**

ENDORSEMENT # 17

This endorsement, effective *12:01 am    March 8, 2007*          forms a part of
policy number  *966-95-20*
issued to   *OFFICE DEPOT, INC.*

by      *American International Specialty Lines Insurance Company*

### "PROFESSIONAL SERVICES" DEFINITION AMENDATORY ENDORSEMENT

**This endorsement amends the PRINTERS E&O MODULE Module of the policy.**

In consideration of the premium charged, it is hereby understood and agreed that Clause
5. **MODULE DEFINITIONS** of the PRINTERS E&O Module, paragraph MPL(d), "**professional
services**," is deleted in its entirety and replaced with the following:

MPL (d)   "**Professional services**" shall mean printing services that are performed:

    (i)       by **you**; or

    (ii)      for **you** by others acting under **your** trade name.

ALL OTHER TERMS, CON ⌐ʹIONS AND EXCLUSIONS REMAIN UNCHANGED.
(c) American I ʒrnational Group, Inc.  All rights reserved.

EXHIBIT C

PAGE 569

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 17*

## ENDORSEMENT # *18*

This endorsement, effective *12:01 am*     *October 31, 2007*                forms a part of
policy number  *966-95-20*
issued to *OFFICE DEPOT, INC.*

by   *American International Specialty Lines Insurance Company*

### FORMS INDEX (AMENDED)

In consideration of the premium charged, it is hereby understood and agreed that the "Forms Index"
Endorsement is amended to include the following:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | "PROFESSIONAL SERVICES" DEFINITION AMENDATORY ENDORSEMENT |
| PENMAN | 01/05 | Forms Index (Amended) |
| MNSCPT | | PRINTERS E&O MODULE |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable

EXHIBIT C
PAGE 570

*END 18*

(1/05)                          Page 1 of 1



**AIG netAdvantage®**
*Modular Edition®*

## PRINTERS E&O MODULE
### PROFESSIONAL LIABILITY INSURANCE

### 1. MODULAR FORMAT

This MPL Module is a part of an AIG ProTech Modular Edition policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules.  This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above.  The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.  THIS COVERAGE MODULE IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS.

### 2. BASE INSURING AGREEMENT

In Clause 2. **INSURING AGREEMENTS** of the BASE Section, COVERAGE A: LIABILITY FOR DAMAGES does not apply to the coverage afforded under this Coverage Module

### 3. MODULE INSURING AGREEMENT

#### COVERAGE A: LIABILITY FOR DAMAGES

**We** shall pay amounts, in excess of the applicable Retention, **you** or any **additional insureds** are legally obligated to pay as **damages** arising from a **claim**

    (i)      made against **you** or such **additional insured**, or

    (ii)     for **liability from others**,

for **wrongful acts.**

### 4. BASE DEFINITIONS

With respect to the coverage afforded under this Coverage Module only, the definitions of the BASE Section are hereby deleted and replaced, or amended (as applicable) as follows:

**"Leased worker"** is deleted in its entirety and replaced with the following:

> **"Leased worker"** means any person provided by an employment contractor or agency under an agreement between an **organization** and the employment contractor or agency to perform duties related to the conduct of an **organization's professional services.**

**"Loss"** is deleted in its entirety and replaced with the following:

> **"Loss"** means the total sum of **damages** and **claim expenses**.  **"Claim expenses,"** **"damages"** and **"loss"** shall not mean and this policy shall not cover: (1) compensation, benefits, overhead, charges or expenses of any **insured** or such **insured's employees**; (2) production costs or the cost of recall, reproduction, reprinting or correction of material by any person or entity; (3) **your** cost of providing, correcting or re-performing or completing any **professional services** or **Internet professional services**; (4) any costs or expenses incurred by any person or entity to withdraw or

© 2005 American International Group, Inc.
All rights reserved.

EXHIBIT C

recall material, media, medium (including CD's, DVD's, cassettes and LP's), products (including products of others which incorporate **your** products) or professional services from the marketplace, or from loss of use arising out of such withdrawal or recall; (5) civil or criminal fines or penalties; (6) taxes; (7) any amounts for which an **insured** is not financially liable or which are without legal recourse to an **insured**; (8) the costs and expenses of complying with any injunctive or other form of equitable relief; (9) the monetary value of any electronic fund transfer or transaction by an **insured** or on **your** behalf, which is lost or diminished during transfer into, out of or between an **insured's** accounts; (10) liquidated damages; and (11) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

5. **MODULE DEFINITIONS**

MPL (a)   "**Internet professional services**" means any of the following services:

(1) "**Application service provider (ASP services)**," which means providing access to computer applications controlled by **you** for use by others through the **Internet**;

(2) "**Domain name registration services**," which means the following services provided in order to facilitate navigation of the **Internet**: collecting, processing or maintaining information provided to **you** which is necessary for registering a domain name; registering a domain name; or accepting or maintaining a record of domain names in a database;

(3) "**e-Commerce transaction services**," which means the following services provided on behalf of others through the **Internet**: processing electronic transactions; registering **Internet** users; or collecting or organizing information provided by **Internet** users, including demographic and transactional data;

(4) "**Electronic exchange and auction services**," which means: the electronic matching of third-party buyers and third-party sellers of goods or services through the **Internet**; and providing **e-commerce transactions services** with respect to such buyers and sellers;

(5) "**Internet hosting services**," which means: housing or maintaining physical control over others' computer file servers connected to the **Internet**; or providing storage of others' electronic data on **your computer systems** connected to the **Internet**, for the purpose of transmitting electronic data through the **Internet**;

(6) "**Internet media services**," which means:  the electronic publishing or display of material (including **advertising**) on an **Internet** site; or providing or maintaining of: instant messaging, web-conferencing, webcasting, **Internet**-based electronic mail, online forums, bulletin boards, list-serves or chat rooms;

(7) "**Internet service provider (ISP services)**," which means providing direct access to the **Internet**;

(8) "**Managed and network security services**," which means: reviewing, analyzing, or consulting with respect to written security policies intended to prevent a **computer attack**; analyzing, testing, or monitoring the **security** infrastructure or vulnerabilities of **computer systems**; implementing, managing or maintaining **security**; providing content filtering **security**; providing **security** patch administration; providing security audits; or preparing security assessment reports;

**EXHIBIT C**

© 2005 American International Group, Inc.
All rights reserved.

(9) **"Public Key Infrastructure Services**," which means: developing, implementing, or managing public key infrastructure; registering, authenticating or validating the identities of users of public key infrastructure; issuing or managing electronic security credentials or digital certificates for message encryption; monitoring or maintaining the integrity or security of electronic information transmitted using public key infrastructure;

(10) **"Search engine services**," which means providing search or navigational computer applications to allow others to locate electronic data through the **Internet**; or

(11) **"Web portal services**," which means organizing, aggregating, or providing access to electronic data, material or any service described above in this definition, through an **Internet** site commonly known as a "web portal."

MPL (b) **"Liability from others"** means vicarious liability of any **insured** for **damages** from **wrongful acts.**

MPL (c) **"Over-redemption"** means coupons, price discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

MPL (d) **"Professional services"** shall mean printing services that are performed:

    (i) by **you**; or

    (ii) for **you** by others acting under **your** trade name;

    for others for compensation:

MPL (e) **"Wrongful act"** means any actual or alleged negligent act, error, omission, breach of duty, misstatement or misleading statement, committed or omitted on or after the **retroactive date** in the performance of or failure to perform **your professional services**

## 6. BASE EXCLUSIONS

Exclusions in Paragraphs 4(a) (fraudulent acts), 4(e) (intellectual property infringement), 4(f) (**trade secret**), 4(g) (personal injury), 4(h) (false **advertising**), 4(i) (FTC, HHS, OCR), 4(o) (breach of contract), 4(p) (contractual obligations) and 4(r) (**insured** v. **insured**) of the BASE Section are not applicable to this Coverage Module.

## 7. MODULE EXCLUSIONS

MPL (a) arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, or gaining of any profit or advantage to which an **insured** is not legally entitled; however, **we** will defend **suits** alleging any of the foregoing conduct until there is a judgment against, final adjudication against, adverse finding of fact against, adverse admission, at which time **you** shall reimburse **us** for **claim expenses**; provided, however, **we** will not defend such **suits** if they allege any of the foregoing conduct which has been the subject of a criminal proceeding in which an **insured** has been found guilty, or pleaded *nolo contendere* or no contest;

MPL (b) alleging, arising out of or resulting, directly or indirectly, from any infringement of any patent, copyright, trademark, trade dress, trade name, service mark or other intellectual property;

**EXHIBIT C**

© 2005 American International Group, Inc. All rights reserved.
**PAGE 573**

MPL (c)  alleging, arising out of or resulting, directly or indirectly, from any misappropriation of **trade secret**;

MPL (d)  arising out of or resulting, directly or indirectly, from **Internet professional services**;

MPL (e)  alleging, arising out of or resulting, directly or indirectly, from an actual or threatened **computer attack** to **your computer system**;

MPL (f)  alleging, arising out of or resulting, directly or indirectly, from any:

    (1)  malicious prosecution; or

    (2)  invasion of any right of privacy.

MPL (g)  alleging, arising out of or resulting, directly or indirectly, from any (1) false or deceptive **advertising** or misrepresentation in **advertising** of **your** products or services, or (2) unfair competition based on such **advertising**, including, but not limited to, **advertising** related violations of any local, state or federal consumer protection or privacy laws;

MPL (h)  against **you** that is brought by or on behalf of:

    (1)  the Federal Trade Commission ("FTC"), the Department of Health and Human Services ("HHS"), the Office of Civil Rights ("OCR"), the Federal Communications Commission ("FCC") or any other federal, state or local government agency, or foreign government agency; or

    (2)  the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers, Broadcast Music, Inc., or any other licensing or rights organizations in such entity's regulatory, quasi-regulatory or official capacity, functions or duties;

    provided, however, this exclusion shall not apply to any **claim** for otherwise covered **wrongful acts** in **your** performance of **professional services** for any of the foregoing government agencies or licensing or rights organizations;

MPL (i)  alleging, arising out of or resulting, directly or indirectly, from any **insured** (1) advising, requiring, obtaining, or (2) failing to advise, require, obtain, effect or maintain any bond, suretyship or other insurance;

MPL (j)  alleging, arising out of or resulting, directly or indirectly, from any liability or obligation under any contract or agreement or out of any breach of contract; however, this exclusion does not apply to any:

    (1)  liability or obligation an **insured** would have in the absence of such contract or agreement; or

    (2)  liability or obligation under a contract for **professional services** from a **wrongful act**;

MPL (k)  alleging, arising out of or resulting, directly or indirectly, from any guarantee or express warranty; inaccurate, inadequate, or incomplete description of the price of goods, products or services; or any failure of goods, products or services to conform with an advertised quality or performance; or liquidated damages; or any failure to provide goods or products, or perform services within a specified time period, by a deadline or according to specified milestones; or the collection of or seeking the return of fees or royalties or other compensation paid to an **insured**; or **your** cost of providing, correcting or re-performing or completing any **professional services**; or any

© 2005 American International Group, Inc.
All rights reserved.

**EXHIBIT C
PAGE 574**

insured's fees, cost or profit guarantees, cost representations, contract price, or estimates of probable costs or cost estimates being exceeded;

MPL (l)  alleging, arising out of or resulting, directly or indirectly, from any violation of any **insured's privacy policy** or any failure of any **insured** to maintain a **privacy policy;**

MPL (m)  against an **insured** that is brought, directly or indirectly, by or on behalf of:

 (1)  any of **you;**

 (2)  any business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by **you;**

 (3)  any parent company, subsidiary, director, officer, partner, trustee, successor or assignee of **yours**, or any person or entity affiliated with **you** or such business entity through common majority ownership or control; or

 (4)  any independent contractor of an **insured** or any **leased worker**; however, this exclusion shall not apply to **claims** arising out of **your professional services** provided to such independent contractor; or

MPL (n)  arising out of a **wrongful act** committed with the knowledge that it was a **wrongful act**; or

MPL (o)  alleging or arising out of **over-redemption.**

<End of Module>

© 2005 American International Group, Inc.
All rights reserved.

EXHIBIT C
PAGE 575